PEOPLE v REED

1. SEARCHES AND SEIZURES—CONSENT—VOLUNTARINESS—ABSENCE OF
   WARRANT.
   A consent to a search when a party is not in custody may be
   valid and voluntary even though the party searched was not
   informed that he has a constitutional right to refuse permission
   to search in the absence of a search warrant.

2. SEARCHES AND SEIZURES—CONSENT—VOLUNTARINESS—COERCION.
   The state must demonstrate that a party's consent to a search
   was in fact voluntarily given and not the result of duress or
   coercion, express or implied, where the subject of a search was
   not in custody and the police attempt to justify a search on the
   basis of his consent (US Const, Ams IV, XIV).

3. SEARCHES AND SEIZURES—SEARCH WARRANT—WAIVER—CONSENT—
   COERCION—BURDEN OF PROOF.
   The obtaining of a search warrant may be waived by an individ-
   ual and he may give his consent to search and seizure, but such
   waiver or consent must be proved by clear and positive testi-
   mony and there must be no duress or coercion, actual or
   implied, and the prosecutor must show a consent that is une-
   quivocal and specific, freely and intelligently given.

4. CRIMINAL LAW—STATEMENTS—ADMISSIBILITY—CUSTODIAL INTERRO-
   GATION—PROCEDURAL SAFEGUARDS—BURDEN OF PROOF—SELF-
   INCRIMINATION.
   The prosecution may not use statements, whether exculpatory or

REFERENCES FOR POINTS IN HEADNOTES
[1–3] 68 Am Jur 2d, Searches and Seizures §§ 46–53, 100, 101, 126.
[4, 5] 21 Am Jur 2d, Criminal Law § 314.
   29 Am Jur 2d, Evidence §§ 555–557.
[6] 21 Am Jur 2d, Criminal Law §§ 485–487, 505.
   29 Am Jur 2d, Evidence § 523 *et seq.*
[7] 21 Am Jur 2d, Criminal Law §§ 449, 485, 493, 494.
[8] 29 Am Jur 2d, Evidence §§ 792, 797, 798.
   Admissibility of photograph of corpse in prosecution for homicide or
      civil action for causing death. 159 ALR 1413, s. 73 ALR 841.
[9] 58 Am Jur, Witnesses §§ 675, 688, 767 *et seq.*
[10] 40 Am Jur 2d, Homicide §§ 484, 485, 499, 525–535.

inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination; custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

5. CRIMINAL LAW—EVIDENCE—STATEMENTS—INVESTIGATORY QUESTIONING—ADMISSIBILITY.

A trial court did not err in allowing into evidence statements made by a defendant before he was advised of his constitutional rights where at the time the defendant was questioned the status of the police inquiry was investigatory and not accusatorial in nature, defendant's statements were not made while he was in custody or otherwise deprived of his freedom of action in any significant way, and the police did not believe defendant had perpetrated the killings under investigation and had no probable cause to arrest the defendant in connection with those crimes.

6. CRIMINAL LAW—EVIDENCE—STATEMENTS—VOLUNTARINESS—ADMISSIBILITY—SELF-INCRIMINATION—CONSTITUTIONAL LAW.

Volunteered statements of any kind made by a defendant are not barred from evidence by the Fifth Amendment. (US Const, Am V).

7. CRIMINAL LAW—EVIDENTIARY HEARING—WITNESSES—PROSECUTING ATTORNEY—PROSECUTION PROMISES—DISCRETION.

A trial judge's refusal to permit a defendant to call an assistant prosecutor as a witness at an evidentiary hearing to determine whether the prosecution had made promises to a prosecution witness and to cross-examine the trial prosecutor after the judge had questioned the trial prosecutor as to whether he had made any promises to the witness did not constitute an abuse of discretion, because there was no evidence in the record to suggest that the assistant prosecutor who was not present had made any promises or representations to secure the witness's testimony against the defendant, the trial prosecutor denied that he had made promises either directly or indirectly, and defendant's counsel denied having received any promises.

8. CRIMINAL LAW—EVIDENCE—PHOTOGRAPHS—ADMISSIBILITY—DISCRETION.

The admission in a murder trial of photographs showing the

murder victims as they were discovered is in the sound discretion of the trial judge.

9. CRIMINAL LAW—EVIDENCE—STATEMENTS—ADMISSIBILITY—IMPEACHMENT.

Inculpatory statements made by a defendant and suppressed before trial can be used for impeachment purposes if the defendant decides to testify; and since the admissibility of evidence for impeachment purposes ultimately turns upon whether the evidence is inconsistent with a witness's testimony, the trial court, as a practical matter, cannot rule upon the use of any specific statement until that statement can be compared with defendant's testimony and therefore there was no error when the trial court declined to rule anticipatorily whether certain inculpatory statements made by defendant could be used to impeach him.

10. CRIMINAL LAW—MURDER—INSTRUCTIONS TO JURY—PREMEDITATION AND DELIBERATION—JURY CONSIDERATION.

A defendant in a murder trial was not prejudiced by the trial court's instructions which limited the jury's consideration to a question of identification of the perpetrator of the crimes and informed the jury that the killings constituted first-degree murder as a matter of law and fact, where the fact that the crimes had been committed was not in dispute.

Appeals from Recorder's Court of Detroit, Geraldine Bledsoe Ford, J. Submitted Division 1 March 9, 1973, at Detroit. (Docket Nos. 14166, 14167.) Decided August 30, 1973. Leave to appeal granted, 391 Mich —.

Ike L. Reed was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Leonard Meyers,* Assistant Prosecuting Attorney, for the people.

*Carl Ziemba,* for defendant.

Before: J. H. GILLIS, P. J., and McGREGOR and ADAMS,* JJ.

PER CURIAM. Defendant appeals as of right from his conviction by jury of first-degree murder. MCLA 750.316; MSA 28.548.

Early on the morning of June 8, 1971, police officers discovered the bodies of Barbara Reed and Glenn Williams lying in an alley near the rear of an apartment building in the City of Detroit. Later that same day police discovered bloodstains and drag marks indicating that the bodies had been dragged into the alley from the apartment building. After searching the basement and three of the four apartments in the building without success, the officers observed defendant approach the door to his apartment. They allegedly requested and received defendant's permission to search the premises. Defendant was arrested after the police noticed a pair of trousers with bloodstains soaking in a sink, and defendant equivocated as to his ownership of the trousers and the origin of the bloodstains.

Defendant was tried by a jury on two separate informations charging him with first-degree murder. Charles Long and John Zellner, testifying for the prosecution, stated that on the night of June 7, 1971 they went to the apartment in question and were admitted by defendant, who was holding a revolver in his hand and immediately told them that he wanted to "off" somebody in the back room. The trio proceeded to the rear of the apartment and observed Mrs. Reed and Williams in bed. Defendant allegedly shot Williams and, with varying degrees of assistance by Long and Zellner,

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

strangled Mrs. Reed, after which the witnesses dragged the bodies into the alley and cleaned up the blood inside the apartment. Zellner and Long attributed their participation in the macabre events to their fear of defendant.

Defendant did not testify. He was convicted of first-degree murder as to both victims, was sentenced to life imprisonment in each case, and now appeals.

## *Issue I*

*Did defendant validly consent to the search of his apartment?*

By way of a pretrial motion to suppress certain incriminating evidence seized by police officers in his apartment, defendant contended that he did not consent to the search and argued that the evidence had therefore been improperly seized. At an evidentiary hearing on defendant's motion, Detective Sergeant Lloyd Clemons testified that he observed defendant approach the apartment door and insert his key in the lock, whereupon Clemons identified himself as a police officer, showed defendant his badge and identification card, asked if defendant lived there and, when defendant responded affirmatively, requested and received permission "to come in and take a look around". Officer Clemons stated that the only persons present in the hall at this time were himself, his police partner, and defendant. Defendant was not advised of his *Miranda*[1] rights at the time of entry because he was not suspected of anything at that time.

Officer Clemons' testimony was corroborated by

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

his partner, Officer Gilbert Hill. Hill stated that defendant had not only consented to the officers' entry, but "was quite courteous and genial" and was "quite cooperative". Hill indicated that at the time of entry he, Clemons, defendant, and at least one other plain-clothes officer were present in the hallway.

The manager of the apartment building first stated that "they [the officers] was not belligerent, they didn't push him around or anything, they just told him to open the door and he opened it", but later stated that he neither heard any conversation at all between the officers and defendant nor observed anyone enter defendant's apartment at the time in question.

Defendant testified that two detectives and two patrolmen ordered him to open the door, that he told them they could not enter until they showed him a search warrant, but that the officers pushed their way into the apartment.

At the conclusion of the evidentiary hearing, the trial court ruled that defendant had validly consented to a search of his apartment. Defendant challenges the accuracy of this determination.

Defendant argued at the evidentiary hearing and now contends that he could not validly have consented to the search since the police did not first inform him that he had a constitutional right to refuse permission to search in the absence of a search warrant.[2] In *Schneckloth v Bustamonte,* 412 US 218, 248–249; 93 S Ct 2041, 2059; 36 L Ed 2d 854, 875 (1973), the United States Supreme Court recently resolved this issue adversely to defendant's contention. The Court there concluded:

"Our decision today is a narrow one. We hold only

---

2 US Const, Am IV; Const 1963, art 1, § 11.

that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."

The law concerning consensual searches is stated in *People v Kaigler,* 368 Mich 281, 294; 118 NW2d 406, 413 (1962), as follows:

"It is elementary that the obtaining of a search warrant may be waived by an individual and he may give his consent to search and seizure; but such waiver or consent must be proved by clear and positive testimony *and there must be no duress or coercion, actual or implied, and the prosecutor must show a consent that is unequivocal and specific, freely and intelligently given."* (Emphasis by the Court.)

In the light of the above-quoted standards, the trial judge did not err in deciding that defendant had validly consented to a search of his apartment.

## *Issue II*

*Did the trial court err by allowing into evidence statements made by defendant before he was advised of his constitutional rights?*

During trial, defense counsel demanded and obtained an evidentiary hearing in the absence of the jury to determine the admissibility of certain statements which defendant made to police officers shortly after they entered his apartment and be-

fore they advised him of his constitutional rights under *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966). At this hearing, Officer Hill testified that defendant cooperated fully with their search of his apartment by walking about with the officers and pointing things out to them. The officers noticed a pair of trousers bearing apparent bloodstains soaking in the kitchen sink. Officer Hill testified regarding this incident as follows:

"*Q.* What happened when you noticed the pants in the kitchen?

"*A.* We asked Mr. Reed either if those were his trousers or whose trousers they were or whatever.

"*Q.* Did you receive a reply?

"*A.* Yes, sir. * *. * He said they were his trousers and that the stains were blood that he had gotten on them at his home on Marlborough when he and his little cousin were playing around with the lawnmower.

"*Q.* Did you make any response to that answer?

"*A.* I did.

"*Q.* What was that, sir?

"*A.* I told him that if the blood on the trousers and the blood in the water matched the blood of the deceased, he would be in trouble.

"*Q.* What did Mr. Reed do at this time, if anything?

"*A.* He changed his story about the trousers.

"*Q.* What did he indicate to you the second time?

"*A.* That he found the trousers on the back steps.

\* \* \*

"*Detective Hill:* Found the trousers on the back steps of 959 Emerson.

\* \* \*

"*Q. (by Mr. Bahen):* Did he indicate to you why he picked them up?

"*A.* Yes. He said that they appeared they might fit him. So he brought them in to soak the blood out of them.

"*Q.* Now, at this time, was Mr. Reed under arrest when he made this second statement?

\* \* \*

"*A.* No. He was not placed—he wasn't placed under arrest or restricted at that time."

The witness stated that at the time of these statements he, his police partner, and two or three other officers were on the premises. According to Hill, defendant was advised of his *Miranda* rights immediately after he changed his story concerning ownership of the trousers, but he was not arrested until later when a police chemist identified the stains as blood.

On cross-examination Officer Hill related that before entering defendant's apartment he and his partner had searched the rest of the building without discovering evidence of a homicide, and that upon entering defendant's premises the physical layout caused him to conclude immediately that the apartment was a "narcotics pad". After walking through the living room and dining room without discerning evidence of the killings, Officer Hill entered the kitchen and noticed the trousers bearing what appeared to be bloodstains. The witness testified:

"*Q.* Did the thought occur to you at that time, Sergeant Hill, that the pants were soaking in order to get blood out of them?

"*A.* Yes.

"*Q.* Did you think at that point that you were getting closer and warmer to a discovery or a determination of the place of the killings of those two people?

"*A.* We felt a lot better—I felt a lot better.

"*Q.* You felt you were closer?

"*A.* I felt better.

"*Q.* Answer the question, Sergeant Hill. Did you feel closer?

"*A.* No. I didn't feel that close at that time.

"*Q.* What do you mean you 'felt better'?

"*A.* I felt that after going through the apartment on the second floor in Mr. Gray's apartment and finding nothing, and seeing the blood there, I felt maybe we were on the right track. I felt a lot better.

"*Q.* You felt maybe you were on the right track?

"*A.* Yes.

"*Q.* Now, at some point you told Mr. Reed that if the blood on the trousers was the same as the blood of the two deceased persons, then he, Mr. Reed, 'was in trouble,' or something to that effect?

"*A.* Yes, sir.

"*Q.* Wouldn't it be fair to say, Detective Hill, that if the blood in the trousers matched the blood of the deceased persons, whoever owned the trousers were *[sic]* in trouble?

"*A.* That is true. I didn't think Mr. Reed owned the trousers.

"*The Court:* Why didn't you think he owned the trousers, Mr. Hill?

"*Detective Hill:* I thought he was a flunky. I thought he was sent there to clean up the place for someone else. I never suspected Mr. Reed.

\*　\*　\*

"*Q. (by Mr. Ziemba):* After Mr. Reed replied to you that those were indeed his trousers, you still didn't suspect Mr. Reed?

"*A.* No, sir. We never really suspected him.

"*Q.* Not even when you said if the blood on the trousers is the same as the blood of the two deceased persons that he was in trouble?

"*A.* That is true.

"*Q.* You didn't suspect him?

"*A.* No, we didn't. We never truly suspected him.

"*Q.* When you asked Mr. Reed if those were indeed his trousers, did you have any idea whatever that he might say that they were?

"*A.* My idea was that Mr. Reed knew what had happened there.

\* \* \*

"*Q.* The question is specifically, at the time you asked Mr. Reed whether those trousers were his, did you have an idea that he might say they were?

\* \* \*

"*Detective Hill:* Yes, sir. We did have some idea they might be his trousers."

Shortly thereafter, the following colloquy ensued:

"*The Court:* Mr. Hill, if I understood you correctly, you said you thought they could have been his pants?

"*Detective Hill:* We thought they were his trousers.

"*The Court:* What was your idea about the whole situation and his being there?

"*Detective Hill:* The idea about the whole situation was, Your Honor, that Ike Reed—we didn't believe Ike Reed actually was involved in the killing of these people. But we believed he had helped dispose of the bodies and helped clean up the place. We thought he might have been wearing those trousers when he cleaned up. We never suspected he was the actual killer.

"*The Court:* And possibly, because he was cleaning up and his pants had gotten blood on them, he put them in the sink?

"*Detective Hill:* Right."

The trial court ultimately ruled that defendant's two statements concerning the trousers had not been obtained in violation of his *Miranda* rights, and admitted these statements into evidence at trial. Defendant contends that the receipt of these statements constituted prejudicial error.

The admissibility of an accused's statements is governed by the following rule enunciated in *Miranda v Arizona, supra,* 384 US 444, as follows:

"[T]he prosecution may not use statements, whether

exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

The question presented in this case is similar to that presented in *People v Wasson,* 31 Mich App 638, 641–642; 188 NW2d 55, 57 (1971), where this Court stated:

"The basic issue thus is whether at the time the statement was made the investigation had become accusatory. If the investigation had reached that stage, the defendant was entitled to be advised of his constitutional rights. [Citations omitted.] The deciding factor, in each case, is determined by examining the specificity of the investigation, *i.e.,* whether the investigation has focused on one suspect."

Our examination of the record convinces us that at the time of Officer Hill's question to defendant the status of the police inquiry was investigatory and not accusatorial in nature and defendant's statements were not made while he was in "custody or otherwise deprived of his freedom of action in any significant way". *Miranda v Arizona, supra,* 384 US 444. At the time of the statements, police officers did not believe defendant had perpetrated the killings and had no probable cause to arrest him in connection with these crimes. *People v Gilbert,* 21 Mich App 442; 175 NW2d 547 (1970), relied upon by defendant, is distinguishable on this basis. Furthermore, defendant's second statement —in which he changed his story regarding ownership of the trousers—was *volunteered* after Officer Hill remarked that if the blood on the trousers

matched that of the victims, defendant would be in trouble. As the *Miranda* Court noted (384 US 478): "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today".

Under all of the facts and circumstances, the trial judge did not err in admitting the challenged statements into evidence.

### *Issue III*

*Did the trial court err by limiting the scope of an evidentiary hearing held to determine whether the prosecution had made promises to a prosecution witness?*

Both defendant and John Zellner were originally charged with first-degree murder in the death of Barbara Reed, both underwent a joint preliminary examination, and both were bound over on the charge. A motion for bail made by Zellner's retained counsel, Robert Mann, was denied at the conclusion of the examination, but later Mann's motions for severance and for bail on behalf of Zellner were granted. Zellner testified for the prosecution at defendant's trial.

During the trial, defendant requested and obtained an evidentiary hearing in the absence of the jury to determine whether any promises or representations were made to Zellner by the prosecution in return for Zellner's testimony against defendant. See *Brady v Maryland,* 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). At this hearing Mann stated that he had informed Officer Hill and a representative of the prosecutor's office, Mr. Connor, that Zellner was willing to testify against defendant, but denied that he [Mann] had received any promises from either Hill or Connor that the

case against Zellner would be dismissed if Zellner testified.

Officer Hill denied that he had ever promised Zellner or Mann that the case against Zellner would be dismissed if Zellner testified against defendant. Hill's police partner, Officer Clemons, denied ever having discussed the subject with Zellner, Mann, Hill, or any other police officer or member of the prosecutor's staff.

The court questioned the trial prosecutor (not under oath), and he denied that he had made any promises to Zellner either directly or indirectly. Defendant now alleges error in that he was not allowed to cross-examine the trial prosecutor and was not permitted to call Connor as a witness.

The trial judge did not err by refusing to permit cross-examination after the trial prosecutor, as an officer of the court, denied having made promises to Zellner either directly or indirectly. As for Connor, although he had been in court at the time Zellner's motion for bail was presented and did not oppose the motion, there is no evidence in the record to suggest that Connor made promises or representations to secure Zellner's testimony against defendant, and Zellner's counsel specifically denied having received any such promises from Connor. Under such circumstances, the trial judge's refusal to permit defendant to call Connor as a witness at the evidentiary hearing did not constitute an abuse of discretion.

### Issue IV

*Did the trial judge err by admitting into evidence three photographs of the deceased victims?*

Prior to admission of three black-and-white photographs showing the victims as they were discov-

ered, defense counsel argued that because of the testimony by witnesses Long and Zellner the photographs would be merely cumulative on the issue of premeditation and malice, that the gruesomeness of the pictures outweighed their probative value and that, if admitted, they would unduly prejudice the jury against defendant. Of six photographs proposed for introduction by the prosecution, the trial judge ruled three to be admissible.

The issue here presented is controlled by the holding in *People v Eddington,* 387 Mich 551, 562; 198 NW2d 297, 301 (1972), where the Court stated:

"In a criminal case, the burden is upon the people to prove every element of the crime charged. These are not nice pictures but they are not any more gruesome than some of the testimony by witnesses. The pictures showed the victims as they were found. The pictures depict the *corpus delicti.* The admission of such evidence is in the sound discretion of the trial judge."

We have examined the challenged photographs and are not persuaded that the trial judge abused her discretion by admitting them into evidence.

### Issue V

*Did the trial judge commit reversible error by eliciting hearsay testimony from a witness?*

During defense counsel's cross-examination of Officer Hill, the following ensued:

"*Q.* Did you make any representations, ever, to Mr. Robert Mann that John Zellner would not be brought to trial in the case of the People vs. John Zellner if John Zellner testified against Ike Reed?

"*A.* No, sir, I didn't. I couldn't do that anyway.

"*The Court:* May we ask what conversation, if any, specifically you had with Mr. Mann?

"*Detective Hill:* Yes, you can.

"*The Court:* What conversation did you have, Mr. Hill?

* * *

"*Mr. Ziemba (interposing):* I object to this procedure, your Honor.

"*The Court:* Very well. Would you continue, please, Mr. Hill.

* * *

"*Detective Hill:* This conversation took place in the Homicide Section of the Detroit Police Headquarters. I don't know the date. But Mr. Mann had been to see his client. And he told me that after talking to his client, he thought that the witness, Charles Long, was lying. And he said he thought that Charles Long attributed to John Zellner at the preliminary examination what he, Charles Long, had done himself. He thought his client was innocent. And he suggested that I go and talk to him. He was of the opinion that his client could convince me of his innocence."

Defendant maintains that his efforts to impeach prosecution witness Zellner were heavily handicapped because Officer Hill's hearsay recitation tended to bolster Zellner's credibility. Defense counsel's efforts to attack the credibility of Zellner on the basis of prosecution promises made to Zellner apparently had no basis in fact, as is shown under Issue III, *supra.* While we agree that the trial court erred by eliciting Hill's recital of Mann's alleged comments to him, we are persuaded that the error complained of was harmless beyond a reasonable doubt.

### Issue VI

*Did the trial judge commit prejudicial error by declining to rule upon the admissibility for impeachment purposes of certain inculpatory state-*

*ments made by defendant and suppressed before trial?*

Prior to trial, certain inculpatory statements made by defendant were suppressed by court order pursuant to a stipulation between defendant and the prosecution that the statements had been elicited as a result of police promises that defendant would not be prosecuted. The suppression order specifically reserved to the trial judge the right to determine whether the suppressed statements could be utilized for impeachment purposes should defendant elect to testify at trial.

Near the conclusion of the people's case, defense counsel requested the court to decide whether the statements would be usable for impeachment purposes should defendant decide to testify. The trial judge requested an offer of proof detailing the circumstances under which the suppressed statements were given, and declined to rule anticipatorily when the offer of proof was not furnished. Defendant did not testify at trial, and now contends that the trial court erred by failing to rule that the suppressed evidence could not be used for impeachment purposes.

In *Harris v New York,* 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971), the United States Supreme Court held that statements obtained in violation of a defendant's *Miranda* rights could be utilized to impeach the defendant's testimony at trial. The Michigan Supreme Court in *People v Graham,* 386 Mich 452; 192 NW2d 255 (1971), quoted *Harris* with approval and ruled that evidence that a defendant chose to exercise his Fifth Amendment right to remain silent during interrogation was admissible for the purpose of impeaching his testimony at trial.

Defendant's contention that the suppressed

statements were intrinsically unusable for impeachment purposes therefore is unfounded. Furthermore, since the admissibility of evidence for impeachment purposes ultimately turns upon whether the evidence is inconsistent with a witness's testimony, the trial court, as a practical matter, could not rule upon the use of any specific statement until that statement could be compared with defendant's testimony. There was no error.

*Issue VII*

*Did reversible error occur as a result of prosecutorial miscomment during closing argument?*

In discussing the trial testimony of prosecution witnesses Long and Zellner, the prosecutor during closing argument stated:

"The routine investigation somehow showed they were involved. And they were brought before you to testify. Now, why would they want to testify before Mr. Reed? Many reasons. And I am sure you will hear of many more of them. Maybe they want to save themselves. This is possible. Maybe they did it themselves and they are getting together. This is possible, also. Maybe one did it. Maybe Mr. Zellner did it and Mr. Long is trying to save Mr. Zellner. This is possible. Maybe Mr. Long did it and Mr. Zellner is trying to save Mr. Long. All of these things are possible. But the reason I think you should give some consideration to is simply they wanted to testify because Ike Reed did it. Ike Reed *implicated them in this matter.* (Emphasis added.)

Defense counsel immediately objected that the prosecuting attorney's final statement was not supported by any evidence in the record. The prosecutor withdrew the remark. The trial judge sustained the objection, ordered the remark stricken, and instructed the jury to disregard the

statement. As a result of the trial court's prompt corrective action, the error was cured and defendant was not prejudicially injured thereby.

*Issue VIII*

*Did the trial judge err reversibly by removing from jury consideration the elements of premeditation and deliberation?*

In instructing the jury, the trial judge stated:

"I am going to describe for you or define for you briefly what the charge of murder encompasses. The reason I am not going to go into it with you in any more extensive detail is the fact that there has been no dispute about the fact here that the offense charged, that is murder in the first degree, is the offense that was committed. The issue, of course, will be whether the defendant is guilty of committing that offense.

"Now, murder at common law, and as charged in this information, is defined as being where a person or persons of sound memory and discretion wilfully and unlawfully kill any human being against the peace of the State with malice aforethought expressed or implied. Murder of the first degree is a killing done wilfully and with premeditation. And when we talk about premeditation, we mean to consider or plan the act of killing beforehand. *And as I have said, I am instructing you both as a matter of fact and as a matter of law in connection with these proceedings, that the killings here are murder in the first degree.*" (Emphasis added.)

Defendant objected to this instruction.

The trial court, in a criminal case, may state that the evidence supporting a given fact is undisputed (if such is the case). However, the court should not declare as fact that which the undisputed evidence tends to show. *People v Pratt,* 251 Mich 243; 231 NW 564 (1930); *People v Wojnicz,* 12

Mich App 423; 162 NW2d 904 (1968). Standing alone, the challenged instruction would constitute a partial directed verdict of guilty and would be reversible error. *People v Pratt, supra; People v DeFore,* 64 Mich 693; 31 NW 585 (1887); *People v Brian Harris,* 37 Mich App 409; 195 NW2d 29 (1971); *People v Wojnicz, supra.*

Each information charged defendant with first-degree murder. During his opening statement defense counsel declared:

"Members of the jury, you will hear, indeed, as the prosecutor has indicated to you, that on June 7th or June 8th of last year, two people met their death unnaturally, and in what probably can be characterized as a brutal and repulsive manner. You will be asked in this case to decide whether Mr. Reed is guilty of their murder. That will be the question. *Not whether or not these people died. Not whether or not these people were murdered. That they met their death unnaturally, I think that will be quite clear.*" (Emphasis added.)

In *People v Griffen,* 36 Mich App 368, 371; 194 NW2d 104, 105 (1971), which involved a prosecution for second-degree murder, the trial judge in his charge to the jury stated:

"I may say that I don't believe this jury is going to have much difficulty in arriving at the conclusion that a felonious homicide was committed, and that the homicide was second-degree murder."

This Court held (p 371; 194 NW2d p 105):

"The comment was improper, and if the fact that a homicide had been committed had been disputed, it would require reversal, *People v Wichman,* 15 Mich App 110; (1968). However, the fact that a homicide had been committed was not disputed at trial. The contest was over who did it and defendant's defense was that

he did not do it. If the comment was error, it was not reversible error."

The defense theory in the instant case, consistently followed during the course of the trial, was that defendant was not in the apartment at the time of the homicides. In view of that theory, the fact that each information charged defendant with *first-degree murder,* and defense counsel's above-quoted statement, defendant was not prejudiced by the trial court's instructions which limited the jury's consideration to a question of identification of the perpetrator of the crime, where the fact that the crime had been committed was not in dispute. See *People v Daleo,* 43 Mich App 386; 204 NW2d 315 (1972); *People v Spaulding,* 42 Mich App 492; 202 NW2d 450 (1972); *People v Allen,* 42 Mich App 195; 201 NW2d 353 (1972); *People v Griffen, supra.*

We have carefully considered defendant's remaining allegations of error and find that they do not merit discussion.

Affirmed.