PEOPLE v LANGLEY

1. CRIMINAL LAW—ACCUSATORY INVESTIGATIONS—MIRANDA WARN-
   INGS—FACTORS—SUSPECTS.

   The deciding factor in determining whether a criminal investiga-
   tion has become accusatory and a defendant is entitled to the
   *Miranda* warnings is whether the investigation has focused on
   one suspect, and that is determined by examining the totality
   of the circumstances.

2. CRIMINAL LAW—EVIDENCE—POLICE INVESTIGATIONS—STATEMENTS—
   VOLUNTARINESS—ADMISSIBILITY—MIRANDA WARNINGS.

   A defendant's response to a police officer who asked "What
   happened?" in his initial inquiry at the scene of a homicide
   before the *Miranda* warnings were given was admissible and
   improperly suppressed where police had entered a dwelling,
   viewed a body, and confronted the defendant, the officer was
   not particularly suspicious of the defendant, and the defendant
   was not deprived of her freedom of action in any significant
   way at the time the question was asked.

3. CRIMINAL LAW—EVIDENCE—ADMISSIBILITY—PRIVATE INDIVIDUALS—
   CONSTITUTIONAL LAW—REASONABLENESS.

   Evidence obtained by a private individual, not acting under the
   authority of the state, may be admissible in a criminal case

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 5 Am Jur 2d, Arrest § 69.
  21 Am Jur 2d, Criminal Law §§ 314, 357, 440 *et seq.*
  29 Am Jur 2d, Evidence §§ 555–557.
  Necessity of informing suspect of rights under privilege against self-
    incrimination, prior to police interrogation. 10 ALR3d 1054.
[3] 29 Am Jur 2d, Evidence § 417.
  Modern status or rule governing admissibility of evidence obtained
    by unlawful search and seizure. 50 ALR2d 531.
[4, 5] 68 Am Jur 2d, Searches and Seizures §§ 49, 50, 77.
  Search warrant: Sufficiency of description of apartment or room to
    be searched in multiple-occupancy structure. 11 ALR3d 1330.
  Authority to consent for another to search or seizure. 31 ALR2d
    1078.

even if the individual's actions in obtaining the evidence were not constitutionally reasonable (US Const, Am IV).

4. SEARCHES AND SEIZURES—THIRD PERSONS—CONSENT TO SEIZURE—ASSUMING THE RISK—WAIVER OF CONSTITUTIONAL PROTECTION—POSSESSION—CONTROL OF PROPERTY—EXCLUSIVENESS.

A third person may not waive a defendant's constitutional protection against unreasonable search and seizure by the police where the defendant's possession and control of property is exclusive of the third person, but a criminal defendant assumes the risk that a third person may consent to a seizure by police of property from a bedroom of which the defendant and the third person are joint owners and joint occupants and in which the property to be seized is jointly handled.

5. SEARCHES AND SEIZURES—INVASION OF RIGHTS—CONTROL OF PROPERTY.

No rights of a criminal defendant, constitutional or otherwise, are invaded when property not under control of the defendant is searched.

Appeal from Recorder's Court of Detroit, Samuel C. Gardner, J. Submitted June 2, 1975, at Detroit. (Docket No. 21279.) Decided August 13, 1975.

Mary L. Langley was charged with second-degree murder. Defendant's motion to suppress certain evidence and statements granted. Plaintiff appeals by leave granted. Reversed in part and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Patricia J. Boyle,* Principal Attorney, Research, Training and Appeals, and *Raymond P. Walsh,* Assistant Prosecuting Attorney, for the people.

*Robert E. Berg, Jr.,* for defendant.

Before: DANHOF, P. J., and R. B. BURNS and R. M. MAHER, JJ.

DANHOF, P. J. Defendant Mary L. Langley is charged with second-degree murder. MCLA 750.317; MSA 28.549. The trial court granted the defendant's motion to suppress certain evidence and statements. From this order, the plaintiff appeals by leave granted.

The record in this case indicates that on May 13, 1974 at approximately 2:30 p.m. a unit of the Emergency Medical Service (EMS) of the Detroit Fire Department arrived at the home of the victim, Sidney Smith, and found him dead with numerous puncture wounds in his chest. An EMS man then called the police, who arrived at approximately 2:55 p.m. The police officers went into the bedroom where the victim's body was located.

Shortly after 3 p.m. the police officers led the defendant from a hallway near the bedroom into the front room. One of the officers then asked the defendant what had happened. The defendant stated that she had left the house at 12 o'clock noon and returned at 2:40 p.m. and found the victim laying face down between the wall and the bed. She had pulled him on to the bed and then called the EMS.

Subsequent to this question and response, the police officer was informed that earlier a witness had seen the defendant place something in a garbage receptacle in the alley. The police later found a knife wrapped in newspaper and placed in a paper bag in a garbage receptacle in the alley.

At the time of the question, the defendant was not informed of her *Miranda* rights.[1] The defendant was not under arrest, but the officer did state that she was not free to leave. The officer further stated he was not suspicious of the defendant until

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

he was informed that she had been seen putting something in a garbage receptacle. However, the officer did refer to her as a suspect at the time of the question.

On May 14, 1974, another police officer responded to a phone call from the deceased's brother, who informed the officer that he was at the house of the deceased and that he had found a blouse he believed had a blood spot on it. Upon arrival at the house, the officer received the blouse from the brother. The brother then admitted the police into the bedroom where the homicide occurred. The police seized a towel and a heating pad found in the bedroom.

The first issue presented is whether the defendant was entitled to her *Miranda* warnings before the police officer asked her what had happened.

*People v Reed,* 393 Mich 342, 357; 224 NW2d 867 (1975), states the applicable test:

> "In determining whether the investigation had become accusatory and the defendant entitled to his *Miranda* warnings, the Court of Appeals applied the rule in *People v Wasson,* 31 Mich App 638, 642; 188 NW2d 55 (1971), that the 'deciding factor, in each case, is determined by examining the specificity of the investigation, *i.e.,* whether the investigation has focused on one suspect'. 49 Mich App 308, 319. * * * We approve the test employed and believe it should be used by examining the totality of the circumstances."

*People v Herman Jackson,* 37 Mich App 664; 195 NW2d 312 (1972), *lv den* 388 Mich 767 (1972), provides guidance as to what circumstances do not warrant giving *Miranda* warnings. In *Jackson,* the police entered the dwelling where the homicide occurred, saw the deceased in a pool of blood, and then confronted the defendant. The police officer

initially asked the defendant his name. He then asked the defendant, "What happened?" To this question, the defendant made certain statements. The officer testified that he considered the defendant a suspect as soon as he had seen the body of the deceased. As to whether these circumstances warranted the *Miranda* warnings, the Court stated at 669:

"It is quite obvious that *any* questioning *anywhere* by a police officer generates some pressures and anxieties. However, before defendant's contention can be afforded substance under *Miranda,* the question that must be answered is whether he was in custody or deprived of his freedom of action in any significant way when the officer asked "What happened?" Therefore, it is necessary for this Court to determine under what circumstances the statements of defendant were made.

"The question asked by the officer was not the product of a process of interrogation aimed at eliciting incriminatory statements from one whom an investigation had focused upon. Instead, it was a situation of an officer reacting naturally and spontaneously to the scene before him. It was a routine means of commencing an investigation and not an inquiry made pursuant to an already-launched investigation. The defendant had not as yet been placed under arrest; neither was he in foreign surroundings nor in a 'police-dominated atmosphere' as stressed in *Miranda.*"

The Court concluded that the case presented no violation of *Miranda.*

As in *People v Herman Jackson,* the police in the present case entered the dwelling, viewed the body, and confronted the defendant. In his initial inquiry, the police officer asked, "What happened?" Even though the officer referred to the defendant as a suspect at this point, the officer was not particularly suspicious of the defendant. The officer did not become suspicious to the point that

it could be said that he focused on the defendant to an accusatory degree until he learned the defendant had been seen disposing of something in the alley. Further, for general investigatory reasons, a police officer would not let any person at the scene of the crime leave without some initial interrogation. There is no evidence of physical restraint or the use of other coercion on the defendant at the time this initial question was asked so that it could be said she was deprived of her freedom of action in any significant way. Therefore, under the totality of the circumstances shown in the record, the response by the defendant may not be suppressed because at the time the question was asked the defendant was not yet entitled to the *Miranda* warnings. The trial court ruling suppressing the defendant's statement is reversed.

The second issue is whether the blouse received by the police from the brother of the deceased should be suppressed as an unreasonable seizure under US Const, Am IV.

Admission of evidence obtained by a private individual, not acting under the authority of the state, is not prohibited by the US Const, Am IV, whether his actions were reasonable or not. *People v Harry James Smith,* 31 Mich App 366, 373–374; 188 NW2d 16 (1971).

In the instant case, the brother entered the house of the deceased, found the blouse, and seized it. There is nothing in the record to indicate any governmental involvement other than accepting the blouse from the brother. The police did not encourage the brother to obtain the evidence, nor did the police authorize the brother to seize it. Therefore, the blouse received from the brother was not obtained in violation of the US Const, Am IV. The trial court ruling suppressing the blouse

as evidence to be used against the defendant is reversed.

The third issue is whether the trial court erred in suppressing as evidence the towel and the heating pad, which the police seized after the brother consented to a search of the decedent's bedroom.

Where the defendant and a third person are joint owners and joint occupants of a bedroom and property to be seized is jointly handled, the defendant assumes the risk that the third person will consent to seizure of those items by the police. *People v Chism,* 390 Mich 104, 136–139; 211 NW2d 193 (1973). Where the defendant's possession and control is exclusive of that third person, the latter may not waive the defendant's constitutional protection against unreasonable search and seizure by the police. *People v Flowers,* 23 Mich App 523, 526–527; 179 NW2d 56 (1970), *lv den* 384 Mich 780 (1970). However, even if a third person consents to a search of property over which he has no control, the defendant may not have standing to complain of a seizure by the police. "[N]o rights, constitutional or otherwise, are invaded when property not under the control of defendant is searched." *People v Hale,* 7 Mich App 127, 132; 151 NW2d 240 (1967), *People v Goeppner,* 20 Mich App 425, 429; 174 NW2d 143 (1969), *People v Joshua,* 32 Mich App 581, 585; 189 NW2d 105 (1971), *lv den* 386 Mich 758 (1971).

The record in the present case is not clear as to what persons, outside of the deceased, had possession or control of the area searched or the items seized.[2] Therefore, the case is remanded for further

---

[2] The following exchange between the defense attorney and the police officer in charge of the investigation in the present case fails to establish any facts as to possession or control:

"*Q.* Were you in charge of the homicide—of the investigation of the homicide of Sidney Smith?

"*A.* Yes, I was.

proceedings to determine the possession or control, if any, that the brother of the deceased and the defendant had, and for a determination of the rights based thereon.

Reversed in part; remanded for further proceedings consistent with this opinion.

---

"*Q.* Did you know about that on May Thirteenth, May Fourteenth?

"*A.* May Fourteenth.

"*Q.* 1974?

"*A.* Yes.

"*Q.* Were you at the house the day they initially discovered the body?

"*A.* The Thirteenth, no.

"*Q.* You were there the next day?

"*A.* Correct.

"*Q.* What made you go to that particular address?

"*A.* Received a phone call, eight-ten in the morning on the Fourteenth from Mr. Ronald Smith. He identified himself as the brother of the deceased. Said he was at the house and that he had found a blouse which he believed had a blood spot on it.

"*Q.* Did you make any inquiry as to what he was doing at that house?

"*A.* Yes. He said that he knew the house was vacant because it had happened the night before and he was worried about a break-in, because he had had one previous at that house. And, so, he spent the night there to watch the premises.

"*Q.* In other words, you gathered from that conversation that he did not live in that particular house?

"*A.* I assumed that he didn't live there.

"*Q.* And you don't know if he had been there in a year or two years or three years?

"*A.* I didn't know anything about it.

"*Q.* You didn't know if he had ever been in the house before?

"*A.* No.

"*Q.* You knew that the defendant was in custody, is that correct?

"*A.* That is correct.

"*Q.* And you knew that was the home of the defendant?

"*A.* I didn't know that at the time. I knew it was the home of the deceased.

"*Q.* You didn't know they were living together at that time?

"*A.* Not at that particular time.

"*Mr. Berg:* I have nothing further of this witness." Hearing on motion to suppress, July 16, 1974, pp 39–40.