PEOPLE *v.* GRIFFEN

OPINION OF THE COURT

1. CRIMINAL LAW—WITNESSES—EXPERT WITNESS—REQUESTED WIT-NESS—SURVEYOR.

Denial of defendant's request to be furnished a surveyor to survey the area of the homicide charged to determine distances involved was not reversible error where the trial court furnished defendant with a city map, which contained pertinent distances, and photographs of the street block where the crime occurred.

2. CRIMINAL LAW — WITNESSES — REQUESTED WITNESS — POLICE ARTIST.

Denial of defendant's request for the production of an FBI artist who had made a composite sketch for a police "wanted" circular of a man witnesses saw at the scene of the crime charged was not error where the artist was in Washington, D. C., at the time of defendant's trial, the sketch was not introduced into evidence, and two eyewitnesses testified that the sketch did not resemble the man they saw.

3. CRIMINAL LAW—INSTRUCTIONS TO JURY—JUDGE'S COMMENTS—UN-DISPUTED FACTS.

Trial judge's comment, during his charge, that he did not believe the jury would have much difficulty in arriving at the conclusion that a felonious homicide had been committed and that the homicide was second-degree murder was improper, but not reversible error where the fact that a homicide had been committed was not disputed at trial and the defendant's defense was that he did not commit the crime.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 21 Am Jur 2d, Criminal Law § 348.
[3] 53 Am Jur, Trial § 584 *et seq.*
[4] 53 Am Jur, Trial § 937 *et seq.*
[5] 21 Am Jur 2d, Criminal Law § 310.
[6] 58 Am Jur, Witnesses § 620 *et seq.*
[7] 53 Am Jur, Trial § 480 *et seq.*
[8] 53 Am Jur, Trial § 469 *et seq.*

4. CRIMINAL LAW—READING TESTIMONY—REQUESTED READING.

Permitting portions of a prosecution witness's direct examination testimony, relating to defendant's statements made to the witness while they were in county jail together, to be read back to the jury without also reading that witness's cross-examination testimony was not reversible error where there was no direct conflict between the witness's testimony on direct and cross-examination and the jury had requested to be read only those portions that were read back.

5. CRIMINAL LAW—PROCEEDING IN PROPRIA PERSONA—REQUEST TO DISMISS COUNSEL.

Defendant was not denied his right to proceed *in propria persona* where the trial judge granted defendant's request to dismiss assigned counsel who, at the judge's request, remained to help defendant, if needed, and counsel did conduct the *voir dire* examination of the jury and cross-examined some witnesses.

DISSENT BY LEVIN, P. J.

6. CRIMINAL LAW—WITNESSES—CREDIBILITY—IRRELEVANT ISSUES—OTHER CRIMES.

*The prosecutor, although allowed much latitude in cross-examining to test credibility, cannot bring out independent issues involving other alleged crimes that are entirely dissimilar both in nature and motive and have nothing whatsoever to do with the issue involved.*

7. CRIMINAL LAW—PROSECUTOR'S ARGUMENT—IMPROPER ARGUMENT.

*Prosecutor's introducing into defendant's trial for murder and arguing to the jury the defendant's failure to register for the draft, defendant's employment record, defendant's alleged operation of a blind pig, defendant's alleged ownership of handguns, the testimony of a prosecution witness that defendant had done something to the witness, who had formerly worked as a barmaid for defendant, and the prosecutor's asking defense counsel in front of the jury why, after having been allowed to read the statement the prosecution witness had given the police about what the defendant had done to her, he had not cross-examined her concerning what was allegedly done to her exceeded the permissible bounds of cross-examination and argument; the meritorious issue of who killed the victim may well have been resolved against defendant because the jury was deflected from temperate consideration of the real*

issue by the introduction of irrelevant, inflammatory testimony.

8. CRIMINAL LAW—PROSECUTOR'S ARGUMENT—IMPROPER ARGUMENT.
Prosecutor's challenging defense counsel in the presence of the jury in a murder trial to explain why there had been no cross-examination concerning a prosecution witness's testimony that she had once gone to the police and had given them a statement about what the defendant had done to her, even though defense counsel had been allowed to read the statement was impermissible as a challenge in the presence of the trier of fact to waive a legal right.

Appeal from Recorder's Court of Detroit, Cornelius J. Sullivan, J. Submitted Division 1 September 9, 1971, at Detroit. (Docket No. 9363.) Decided October 19, 1971.

Leon Maurice Griffen was convicted of second-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, *William L. Cahalan*, Prosecuting Attorney, *Dominick R. Carnovale*, Chief, Appellate Department, and *Angelo A. Pentolino*, Assistant Prosecuting Attorney, for the people.

*Armand D. Bove*, for defendant on appeal.

Before: LEVIN, P. J., and QUINN and V. J. BRENNAN, JJ.

QUINN, J. Convicted by a jury of murder of the second degree, MCLA § 750.317 (Stat Ann 1954 Rev § 28.549), defendant was sentenced and he appeals.

Two of the alleged errors relied on for appellate relief were not saved for review, namely: the claimed error in the charge of the court to the jury and the

claim that the pretrial identification process vitiated the in-court identification.

Defendant's request for expert witnesses at trial was denied and this denial is asserted as reversible error. Defendant requested that he be furnished a surveyor to survey the area of the crime in order to determine distances involved. The trial judge furnished defendant with a survey map of the block in question which contained pertinent distances and photographs of the street. We find no reversible error in the denial of defendant's request for a surveyor.

An artist for the FBI made a composite sketch for a police "wanted" circular. Defendant requested production of the artist at trial. The artist was in Washington, D. C., at the time, and the trial judge denied the request. The sketch was not introduced in evidence and two eyewitnesses indicated that the sketch did not resemble the man they saw. Defendant's claim of reversible error in denying his request for production of the artist is not sustained by the record.

During his charge to the jury, the trial judge said:

"I may say that I don't believe this jury is going to have much difficulty in arriving at the conclusion that a felonious homicide was committed, and that the homicide was second-degree murder."

The comment was improper, and if the fact that a homicide had been committed had been disputed, it would require reversal, *People* v. *Wichman* (1968), 15 Mich App 110. However, the fact that a homicide had been committed was not disputed at trial. The contest was over who did it and defendant's defense was that he did not do it. If the comment was error, it was not reversible error.

During its deliberations, the jury requested that portions of witness Copeland's testimony relating to statements made by the defendant to Copeland in the county jail be read back to them. This was done and defendant objected because Copeland's cross-examination was not read. The trial judge overruled the objection and defendant contends this was reversible error. What the jury requested was read; there was no direct conflict between Copeland's testimony on direct and cross-examination. The reading of testimony back to the jury and the extent thereof is a matter of discretion, *People v. Shuler* (1904), 136 Mich 161, 167. This record does not establish abuse of that discretion.

Defendant requested that his assigned counsel be dismissed. This request was granted but at the judge's request, counsel remained to help defendant, if needed. Counsel conducted the *voir dire* examination of the jury and cross-examined some witnesses. Defendant's claim of reversible error because he was denied his right to proceed *in propria persona* is not sustained on this record.

Finally, defendant's contention that he was denied a fair trial is not sustained on this record. Most of the turmoil, chaos, and confusion relied on to support this claim was created by defendant.

Affirmed.


V. J. BRENNAN, J., concurred.


LEVIN, P. J. (*dissenting*). The defendant, Leon Maurice Griffen, was convicted of murdering a milk truck driver.

A number of witnesses saw a man running from the scene of the crime. At the trial none of the

witnesses could identify Griffen as the gunman except Clare Haynes. She testified that she saw a full view of the gunman's face for "a second or half a second" as he ran by her home about 25 feet from where she was standing, and that Griffen was that man.

The shooting occurred on February 7, 1968. Eleven months later, on January 17, 1969, Clare Haynes identified Griffen in a lineup. Her description of the gunman matched that of the other eyewitnesses except that some of the witnesses said that the gunman had a goatee and Clare Haynes did not remember seeing a goatee.

Three months after Griffen was arrested, on April 11, 1969, Robert Copeland was arrested for another crime, the murder of a *beer* truck driver. At Griffen's trial, Copeland testified that Griffen had told Copeland that he had killed the milk truck driver.

Before the trial, on August 8, 1969, Copeland gave the prosecutor a statement implicating Stanley Mitchell in the beer truck driver killing. The murder charge against Copeland was dismissed later that month. On November 1, 1969, Oscar Cooper was also arrested for the beer truck driver killing. It was a few weeks later, November 19, 1969, that Copeland first gave the prosecutor a statement implicating Griffen in the murder of the milk truck driver.

At Griffen's trial Copeland testified that at a party in October, 1968, before either Griffen or Copeland had been arrested, and subsequently, in April 1969, after they both had been arrested and while they were in the county jail, Griffen told him that he had killed the milk truck driver.

Copeland testified that Griffen said that he shot the milk truck driver on the spur of the moment because the driver had just seen him leaving an apartment where he had killed a woman who was supposed to testify against one of Griffin's relatives. That story was inconsistent with the testimony of James Moore, who said that the gunman alighted from an automobile, put gloves on, and then walked over to the milk truck and shot the driver. It was also inconsistent with the testimony of a police officer who said that the police were not able to discover any other shooting on the same day in the area where the milk truck driver was killed.

Griffen took the stand and denied that he committed the crime. He said that he was unable to account for his whereabouts at the time the crime was committed because he was not arrested until almost a year later and he had no recollection of the day the killing occurred.

When Griffen testified he had not previously been convicted of committing a crime. He was asked by the prosecutor, over his lawyer's objection, whether he had ever been in the army. He admitted that he had not been in the army and later admitted that he had not registered for the draft.

The prosecutor also assiduously cross-examined Griffen concerning his employment record and whether Gloria Jackson had ever worked for him.

Gloria Jackson was called by the people as a rebuttal witness. She testified that she had worked for Griffen as a barmaid at a speakeasy that he operated in his apartment, that Griffen owned two handguns,[1] and that she had gone to the police on the encouragement of a Father Ward to report what the defendant "done to me". What Griffen had

---

[1] See *People* v. *Hall* (1969), 19 Mich App 95, 101 (LEVIN, J., concurring in part and dissenting in part.)

"done" to her was not elaborated upon. Father Ward operated a halfway house to which Gloria Jackson had been paroled after she left the Adrian Girls Training School.

During his jury argument the prosecutor stressed Gloria Jackson's testimony that she had gone to the police at the suggestion of Father Ward, that she had given the police a statement and defense counsel had been given an opportunity to read the statement and after reading it he had decided not to cross-examine her regarding the contents of her statement: "I ask you why [defense counsel] didn't cross-examine after spending five minutes reading that statement?" The prosecutor also asked the jury to consider "the credibility of a man who doesn't register for the draft" and his "employment of Gloria Jackson".

The prosecutor's questions and argument manifestly exceeded permissible bounds.

Griffen was on trial for a capital offense. The issue to be decided by the jury was whether he was the gunman who killed the milk driver. The people's case was far from conclusive. Clare Haynes, the only witness who claimed she could identify the gunman, conceded that she had seen a full view of his face for not more than a second. The details of Robert Copeland's testimony that Griffen had admitted committing the crime were inconsistent with established facts; moreover, Copeland had a possible motive for fabricating his testimony.

The meritorious issue may well have been resolved against Griffen because the jury was deflected from temperate consideration of the real issue by the introduction of irrelevant, inflammatory testimony concerning his past.

The observations of the Michigan Supreme Court in *People* v. *Pinkerton* (1889), 79 Mich 110, 114, are in point:

"in a criminal case, we do not think it competent to compel respondent, who is a witness, to answer questions irrelevant to the issue, having a tendancy to bring in other charges. Whatever latitude is proper in cross-examination to test veracity, it cannot properly introduce independant issues against the person who is both witness and respondent."

In the cited case, Jennie Pinkerton's conviction of keeping a house of ill fame was reversed because, among other errors, there had been references to her unchastity and to charges made against her of prostitution.

In *People* v. *Dowell* (1904), 136 Mich 306, 311, it was held improper to bring out during cross-examination of a defendant, charged with the crime of assault with intent to commit the crime of statutory rape, that he had been sued on a previous occasion for taking indecent liberties with another young girl.

More recently, in *People* v. *Simard* (1946), 314 Mich 624, 630–631, the defendant's conviction of inducing an abortion was reversed because on cross-examination the prosecutor brought out that he had signed a medical certificate showing that persons contemplating marriage were free from venereal disease without a laboratory test having been made as required by statute. The Michigan Supreme Court declared:

"While much latitude is allowed in cross-examination to test credibility, the prosecutor cannot bring out independent issues involving other alleged crimes that are entirely dissimilar both in nature and motive and have nothing whatsoever to do with the issue involved."

In *People* v. *Wright* (1940), 294 Mich 20, 29, the Supreme Court, relying on the principle elucidated in *Pinkerton* and the language quoted above taken from that opinion, reversed the defendant's conviction of manslaughter because the prosecutor asked the defendant on cross-examination about earlier incidents when he had brandished a gun. Language quoted above from the *Pinkerton* opinion was also relied on in the civil cases of *Forsyth* v. *Nostrand* (1918), 201 Mich 558, 569, and *Kovich* v. *Church & Church, Inc.* (1934), 267 Mich 640, 644, where judgments were reversed because of improper cross-examination of the party or an employee of the party against whom the judgment was rendered.

Courts in other jurisdictions have recognized the serious and unjustified prejudice done a defendant in a criminal case when it is brought out on cross-examination that he has avoided or not properly discharged his military service obligation and have on that account reversed convictions; there do not appear to be any Michigan decisions.

In *Grigsby* v. *Commonwealth* (1945), 299 Ky 721, 727 (187 SW2d 259, 263), the prosecutor established that the defendant was an escapee from a guardhouse where he was being held as a deserter. The defendant's conviction was reversed, the Court saying:

"We think it apparent that compelling the admission of the defendant that he was or may have been guilty of an offense under the military law, especially of being a deserter in time of war, was calculated to inflame or infuriate the jury against him, and that the cross-examination went beyond the range of fair and legitimate inquiry. Therefore, that a prejudicial error was committed."[2]

---

[2] Similarly, see *Powell* v. *Commonwealth* (1948), 308 Ky 467, 471 (214 SW2d 1002, 1004), where, as in Grigsby, the people proved

In *People* v. *Wilson* (1948), 400 Ill 461 (81 NE2d 211), it was held improper to ask the defendant whether he had not gone AWOL while he was in the army.  Similarly, in *People* v. *Jackymiak* (1943), 381 Ill 528, 535 (46 NE2d 50, 54), the defendant's conviction was reversed because he had been questioned concerning his registration for military service.  The Court observed:

"It had no basis whatever in the record. It neither proved nor tended to prove the guilt of the accused, or any issue involved in the case.  It was not justified under any circumstances by the mere fact that plaintiff in error was improperly permitted in his examination in chief to testify to the fact that he had registered.  The assistant state's attorney did not occupy the role of partisan counsel; he was the people's lawyer.  It was his duty to see that both the state and the defendant received a fair trial according to the law of the land.  The repeated insinuation by the prosecutor that plaintiff in error had never registered for the draft could only convey to the jury the impression that he had violated the laws of the United States and was a draft evader."[3]

On the same principle that the draft evasion line of inquiry was out of bounds, it was completely improper to drag before the jury the red herring of

that the defendant was a deserter from the army.  On the following trial day the judge admonished the jury not to consider the evidence, but, said Kentucky's highest court, "by the time this admonition was given the damage had been done, and we doubt if it was possible for any juror under the circumstances, no matter how fair-minded he may be, to disabuse his mind of such inflammatory testimony."

3 Similarly, see *Harold* v. *Commonwealth* (1927), 147 Va 617 (136 SE 658), where it was brought out that the defendant had been discharged without honor by the army, and *Blackwell* v. *State* (1946), 82 Okla Crim 390 (171 P2d 634), where the court recognized the impropriety of asking a defendant in a criminal case whether he was guilty of draft evasion but, nevertheless, affirmed his conviction because it was not a close case and it was apparent that the defendant was guilty of the offense charged, nonsupport of his minor children.

Griffen's employment record, his operation of a blind pig, the fact that he owned handguns, if he did, the allegation that he had "done" something to Gloria Jackson, and to challenge his lawyer before the jury for an explanation of why he hadn't given Gloria Jackson an opportunity during cross-examination to reveal the contents of the statement she gave to the police concerning, presumably, what Griffen had done to her. "It is not permissible for a litigant to challenge his opponent in the presence of the trier of fact to waive a legal right." *Oakland County* v. *Schoenrock* (1971), 33 Mich App 365, 368.

The impropriety of these inquiries and arguments and the challenge is apparent. Less fundamentally, from a technical point of view, the rebuttal testimony of Gloria Jackson violated the doctrine that "the answer of a witness on cross-examination as to a merely collateral matter becomes binding upon the cross-examiner and may not be contradicted through introduction of further testimony of other witnesses regarding these collateral matters." *People* v. *Joseph Barbara, Jr.* (1970), 23 Mich App 540, 548.[4]

---

[4] Similarly, see *People* v. *MacCullough* (1937), 281 Mich 15, 26, where the Michigan Supreme Court said:

"Where a witness is cross-examined on matters purely collateral, the cross-examiner may not inquire of other witnesses whether the answers given are truthful, because such inquiry would open irrelevant matters."