## PEOPLE v REED

Docket No. 55217. Argued October 10, 1974 (Calendar No. 12).— Decided January 21, 1975. Certiorari denied by the United States Supreme Court June 23, 1975.

Ike L. Reed was convicted in Recorder's Court of Detroit, Geraldine Bledsoe Ford, J., on two counts of first-degree murder. The Court of Appeals, J. H. Gillis, P. J., and McGregor and Adams, JJ., affirmed (Docket Nos. 14166, 14167.) Defendant appeals. *Held:*

1. An instruction to the jury that an essential element of a criminal offense exists as a matter of law is reversible error, and it was error to instruct the jury that the killings were murder in the first degree.

2. It was error to limit the scope of a hearing to determine whether any promises have been made to a prosecution witness charged with crime so as to preclude cross-examination of one prosecutor or the direct examination of another requested by the defense concerning alleged promises to a prosecution witness; such a hearing should include all witnesses and all evidence which can reasonably cast light on the question to be determined.

3. An involuntary confession, because of its untrustworthy evidentiary value, is not usable either as direct evidence or for impeachment purposes, and it was erroneous for the trial judge to refuse to rule in advance that defendant's suppressed involuntary confessions could not be used to impeach him if he

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 47 Am Jur 2d, Jury §§ 47–49.

[2] 75 Am Jur 2d, Trial §§ 698, 699, 727.

[3] 75 Am Jur 2d, Trial § 756.

[4] 75 Am Jur 2d, Trial § 628.

[5] 58 Am Jur, Witnesses § 860 *et seq.*

[6] 58 Am Jur, Witnesses § 713.

[7–11] 29 Am Jur 2d, Evidence § 555 *et seq.*

[12] 68 Am Jur 2d, Searches and Seizures § 35.

[13–15] 68 Am Jur 2d, Searches and Seizures §§ 46, 47.

[16] 68 Am Jur 2d, Searches and Seizures § 48.

testified and if the prosecutor attempted to impeach him by use of the confessions.

4. The investigation had focused on the defendant, and he should have had warning of his constitutional rights before being questioned, where investigating officers had narrowed their investigation to what they believed to be the place of a homicide, the defendant's apartment, and to someone associated with the apartment, whom they believed connected to the homicide by knowledge or more.

5. The search of defendant's apartment without a warrant was reasonable as one to which defendant gave his consent where there is sufficient evidence to support a holding that the police asked permission to enter and that consent was given to a general search; the presence of a large number of officers is not per se coercive of consent, and knowledge of the right to refuse is only one factor in determining voluntariness of consent.

Reversed and remanded for new trial.

49 Mich App 308; 212 NW2d 41 reversed.

1. CRIMINAL LAW—PLEA OF NOT GUILTY—ELEMENTS OF CRIME—JURY TRIAL—CONSTITUTIONAL LAW.

Once a plea of not guilty is entered, the defendant has an absolute right to a jury determination upon all essential elements of the offense, neither depleted nor diminished by what otherwise might be considered the conclusive or compelling nature of the evidence against him; under no circumstances may the trial court usurp this right by ruling as a matter of law on an essential element of the crime charged.

2. CRIMINAL LAW—INSTRUCTIONS TO JURY—MATERIAL ISSUES—DEFENSES—THEORIES.

Instructions to the jury must include all elements of the crime charged and must not exclude from jury consideration material issues, defenses, or theories if there is evidence to support them.

3. HOMICIDE—MURDER—INSTRUCTIONS TO JURY—PREMEDITATION—INTENT.

An instruction to the jury which stated that there was no dispute about the fact that the offense charged, murder in the first degree, was the offense that was committed is patently wrong, because it removed from jury consideration the questions whether the killer had the necessary premeditation and intent.

4. CRIMINAL LAW—INSTRUCTIONS TO JURY—ELEMENTS OF CRIME—
   HARMLESS ERROR RULE.

   An instruction to the jury that an essential element of a criminal
   offense exists as a matter of law is reversible error; the right of
   the jury to determine all elements of an offense is so fundamen-
   tal a right that the harmless error rule is not appropriate
   where the judge invades that province.

5. WITNESSES—CREDIBILITY—EVIDENCE—FAIR TRIAL.

   Evidence concerning the credibility of a witness is relevant in
   ensuring that a defendant receives a fair trial.

6. CRIMINAL LAW—PROSECUTION WITNESSES—PROMISES—HEARING—
   WITNESSES—CROSS-EXAMINATION.

   Once requested, a hearing to determine whether any promises
   have been made to a prosecution witness should include all
   witnesses and all evidence which can reasonably cast light on
   the question to be determined; limiting the scope of the hearing
   by refusing to permit cross-examination of the trial prosecutor
   or direct examination of another prosecutor who had been
   present when the witness was admitted to bail is error.

7. CRIMINAL LAW—STATEMENTS—MIRANDA WARNING—IMPEACHMENT
   —CONFESSIONS.

   Statements made prior to the giving of *Miranda* warnings are
   unusable to prove the elements of the crime charged, but may
   still be used for impeachment purposes if otherwise trustwor-
   thy; involuntary confessions, on the other hand, may never be
   used, both because the police broke the law and more impor-
   tantly because an involuntary confession is always of questiona-
   ble trustworthiness.

8. CRIMINAL LAW—CONFESSIONS—EVIDENCE—ADMISSIBILITY.

   An involuntary confession is not usable either as direct evidence
   or for impeachment purposes.

9. CRIMINAL LAW—CONFESSIONS—IMPEACHMENT.

   Refusing to rule whether defendant's suppressed confessions
   could be used to impeach him if he testified was error.

10. CRIMINAL LAW—WARNING OF RIGHTS—INVESTIGATION—SPECIFIC-
    ITY.

    The deciding factor in determining whether an investigation had
    become accusatory and the defendant entitled to *Miranda*
    warnings is the specificity of the investigation, *i.e.,* whether the
    investigation has focused on one suspect; that test should be
    used by examining the totality of the circumstances.

11. CRIMINAL LAW—WARNING OF RIGHTS—INVESTIGATION—SPECIFICITY.

An investigation had focused on the defendant, and he should therefore have been warned of his constitutional rights before being questioned about the ownership of trousers with blood on them, where police investigators had narrowed down to one apartment that they believed was the place of a homicide, had found the defendant entering the apartment with a key, had been told by defendant that it was his apartment, had been permitted by defendant to enter, had observed signs that there had been blood on the floor, and then found the trousers soaking in red-tinged water with what seemed the remains of blood stains on them.

12. SEARCHES AND SEIZURES—WITHOUT WARRANT—CONSTITUTIONAL LAW—FOURTH AMENDMENT.

A search and seizure without a warrant is unreasonable per se and violates the Fourth Amendment of the United States Constitution and the state constitution unless shown to be within one of the exceptions to the rule; the burden is always on the state to show that such an exception exists (US Const, Am IV; Const 1963, art 1, § 11).

13. SEARCHES AND SEIZURES—CONSENT—QUESTION OF FACT—EVIDENCE —INFERENCES—COERCION—DURESS.

Whether a consent to a search without a warrant is valid is a matter of fact based upon the evidence and all reasonable inferences to be drawn from it; the presence of coercion or duress requires a finding that consent was not given.

14. SEARCHES AND SEIZURES—WITHOUT WARRANT—CONSENT—KNOWLEDGE OF RIGHTS.

Knowledge by the defendant of the right to refuse admission to police is but one factor in the totality of circumstances to be examined in determining whether the defendant consented voluntarily to a search without a warrant.

15. SEARCHES AND SEIZURES—WITHOUT WARRANT—CONSENT.

A defendant had validly assented to police entry of his apartment and search without a warrant where the police testified that they asked if they could come in and look around, that defendant granted permission for them to enter and look around, and that defendant was not only free to wander around the apartment, but also pointed out places for them to search.

16. SEARCHES AND SEIZURES—CONSENT.

> The mere fact that a defendant was in custody, without more, does not necessarily render his consent to a search of his apartment without a warrant involuntary, and the presence of a large number of police officers in the apartment to assist in the search does not present a situation which is per se coercive.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Patricia J. Boyle,* Principal Attorney, Research, Training and Appeals, and *John L. Thompson, Jr.,* Assistant Prosecuting Attorney, for the people.

*Carl Ziemba,* for defendant.

WILLIAMS, J. Blood stains and drag marks led police from two bound and gagged dead bodies found in an alley to defendant's apartment. On request of the police to enter and look around, defendant opened his apartment door resulting in the search of the apartment's rooms and defendant's questioning and arrest.

Defendant claimed 11 different trial errors, of which we find it useful to discuss only the following 5:

(1) Was there error in instructing the jury that the killings were murder in the first degree as a matter of fact and law?

(2) Was it error to limit the scope of a *Brady* hearing so as to preclude cross-examination of one prosecutor and the appearance of another requested by the defense concerning alleged promises to a prosecution witness?

(3) Was it erroneous for the trial judge to refuse to rule whether defendant's suppressed confessions could be used to impeach him if he testified?

(4) Where the trail of evidence seemed to lead to

defendant were *Miranda* warnings required before the police began questioning defendant?

(5) Was error committed in admitting evidence seized as a result of the warrantless search of defendant's apartment?

We answer all but question (5) in the affirmative and reverse and remand for a new trial.

## I —*Facts*

Following their discovery of two bodies in an alley early in the morning of June 8, 1971, Detroit police officers followed a trail of blood stains and drag marks into a nearby apartment building. With the assistance of the apartment manager, they searched the basement and three of the four apartments without a warrant. Upon reaching the fourth apartment, belonging to defendant, the officers testified they "stated [to defendant] that we would like to come in and take a look around." The police thereupon entered and made an extensive search. They found a pair of blood-stained trousers soaking in the sink. When the police first asked defendant about the trousers, he said they were his, and the blood was his from a cut from a lawn mower. A policeman then said "if the blood on those trousers matched the blood from the two bodies found in the alley, he [defendant] was going to be in trouble." Defendant then changed his story and said he had found the trousers and taken them because they appeared to fit. Defendant was then arrested and after that given his *Miranda* warnings.

Defendant was tried by a jury for first-degree murder on separate informations for each decedent. Among witnesses for the prosecution were two individuals who testified they had assisted

defendant. Apparently neither was ever imprisoned for his role, and the case against at least one was dropped. Defendant did not testify.

The jury returned a verdict of murder in the first degree in both cases on March 21, 1972. The Court of Appeals affirmed on August 30, 1973. 49 Mich App 308; 212 NW2d 41 (1973). Defendant claimed 11 errors including the 5 heretofore set forth above.

## II — *Was There Error in Instructing the Jury That the Killings Were Murder in the First Degree as a Matter of Fact and Law?*

In instructing the jury, the trial judge stated:

"I am going to describe for you or define for you briefly what the charge of murder encompasses. The reason I am not going to go into it with you in any more extensive detail is the fact that *there has been no dispute about the fact here that the offense charged, that is murder in the first degree, is the offense that was committed.* The issue, of course, will be whether the defendant is guilty of committing that offense. Now, murder at common law, and as charged in this Information, is defined as being where a person or persons of sound memory and discretion wilfully and unlawfully kill any human being against the peace of the state with malice aforethought expressed or implied. Murder of the first degree is a killing done wilfully and with premeditation. And when we talk about premeditation, we mean to consider or plan the act of killing beforehand. And as I have said, *I am instructing you both as a matter of fact and as a matter of law in connection with these proceedings, that the killings here are murder in the first degree."* (Emphasis added.)

Defendant objected to this instruction.

The Court of Appeals, in finding no error, em-

phasized certain statements of defense counsel in his opening remarks as follows:

"You will be asked in this case to decide whether Mr. Reed is guilty of their murder. That will be the question. *Not whether or not the people died. Not whether or not these people were murdered. That they met their death unnaturally, I think that will be quite clear.*" (Emphasis added.) 49 Mich App 308, 327.

The Court of Appeals then pointed out that the defense theory throughout was alibi. It concluded that that theory and defense counsel's above statement created no prejudice, although the court's instructions "limited the jury's consideration to a question of identification of the perpetrator of the crime, where the fact that the crime had been committed was not in dispute." 49 Mich App 308, 328.

This is not the law.

Once a plea of not guilty is entered, the defendant "has an absolute right to a jury determination upon all essential elements of the offense. This right, emanating from the criminal defendant's constitutional right to a trial by jury, is neither depleted nor diminished by what otherwise might be considered the conclusive or compelling nature of the evidence against him. * * * [F]urthermore, in a situation wherein an understandingly tendered waiver is not forthcoming from the defendant, under no circumstances may the trial court usurp this right by ruling as a matter of law on an essential element of the crime charged." *United States v England,* 347 F2d 425, 430 (CA 7, 1965). (Footnote omitted.)

The trial judge must carefully ensure that there is no trespass on this fundamental right.

The instruction to the jury must include all

elements of the crime charged, *People v Liggett,* 378 Mich 706, 714; 148 NW2d 784 (1967); *People v Pepper,* 389 Mich 317, 322; 206 NW2d 439 (1973), and must not exclude from jury consideration material issues, defenses or theories if there is evidence to support them. 22 Michigan Law & Practice, Trial, § 236, p 386.

In the instant case, the trial court charged:

"[T]here has been no dispute about the fact here that the offense charged, that is murder in the first degree, is the offense that was committed."

Such an instruction is patently wrong. The presence of two dead bodies alone cannot reveal the state of mind of the killer nor the full circumstances of the killing. Without such additional evidence it is impossible to know what degree of homicide was committed.

Obviously it cannot be presupposed, as the instruction did, that first-degree murder was involved for two reasons. First, it cannot logically be presumed that it was murder in the first degree without knowing that the killer had the necessary premeditation and intent. This would require proof beyond the existence and condition of the dead bodies. Second, it cannot legally be presumed for the reason that the necessary premeditation and intent are elements of the crime the prosecution must prove. By instructing as she did, the trial judge incorrectly removed these problems from jury consideration.

The prosecution urges us to accept the rule of *People v Griffen,* 36 Mich App 368; 194 NW2d 104 (1971), and cases relying thereon.[1] In *Griffen,* the trial judge instructed:

---

[1] *E.g., People v Daleo,* 43 Mich App 386, 392; 204 NW2d 315 (1972); *People v Spaulding,* 42 Mich App 492, 497–498; 202 NW2d 450 (1972).

" 'I may say that I don't believe this jury is going to have much difficulty in arriving at the conclusion that a felonious homicide was committed, and that the homicide was second-degree murder.' " 36 Mich App 368, 371.

The Court of Appeals with a strong dissent by Justice (then Judge) LEVIN on another issue, found that, if there was error, it was not reversible, inasmuch as the only dispute at trial was over who committed the homicide.

We find that the right of the jury to determine all elements of an offense is so fundamental a right that the harmless error rule is not appropriate where the judge invades that province. There is a difference between commenting on the evidence and making a finding of fact for the jury. When the trial judge, as in the instant case, instructs that an essential element of a criminal offense exists, as a matter of law, we will find reversible error. Insofar as *Griffen* and progeny contravene this principle, they are overruled.

III — *Was it Error to Limit the Scope of a* Brady *Hearing to Preclude Cross-Examination of One Prosecutor and the Appearance of Another Requested by the Defense Concerning Alleged Promises to a Prosecution Witness?*

A principal witness against defendant was John Zellner. Zellner was charged as defendant's accomplice in the murder of Glenn Williams. Zellner's motion for bail was originally denied, but subsequently both bail and severance from defendant were granted. Zellner thereafter testified against defendant. (Ultimately, after this trial, his case was dismissed.) On the basis of these suggestive

facts defendant asked for a *Brady*[2] hearing to determine whether any promises had been made to Zellner to testify against defendant.

In the *Brady* hearing, Zellner's counsel stated he had advised a police officer and the trial prosecutor that Zellner was willing to testify against defendant but denied receiving any consideration therefor. Both the police officer and his partner denied on the stand that there was any agreement. The trial court questioned the trial prosecutor not under oath, and he denied any promises. The Chief of the Recorder's Court Division of the Prosecutor's Office, who was present when Zellner was admitted to bail, was not called upon to testify. Defense sought unsuccessfully to cross-examine the trial prosecutor and was likewise unsuccessful in calling the Division Chief to the stand.

The issue before this Court is whether the trial judge committed error when she refused to permit, during this hearing, cross-examination of the trial prosecutor or direct examination of the Chief of the Recorder's Court Division of the Wayne County Prosecutor's office.

The trial judge justified this limitation by first noting that as an officer of the court, the prosecutor would of course tell the truth,[3] and by claiming that no connection had been established between the Recorder's Court Division Chief and the defendant-accomplice.

Defendant argues that a determination of whether the witness had a motive to falsify testi-

---

[2] This is held outside the hearing of the jury. Authority is based on *Brady v Maryland,* 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

[3] The trial judge explained:

"You are not going to cross-examine Mr. Bahen. Mr. Bahen is an officer of this Court. And if Mr. Bahen simply tells me—and I wouldn't even have him sworn—if he tells me he had no such communication, the Court will accept that without any more."

mony against him, and a determination of whether the prosecution was withholding information about promises or representations made to him was crucial to the case. Once a hearing is held, he urges, it is the judge's duty to permit counsel to call all who could help reveal the truth.

In *Brady v Maryland,* 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), the United States Supreme Court held[4] that to secure a fair trial to the accused:

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 US 83, 87.

*Napue v Illinois,* 360 US 264, 269; 79 S Ct 1173; 3 L Ed 2d 1217 (1959), stated that:

"The principle * * * does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence * * * ."

In the instant case, the trial judge's refusal to permit defense counsel to proceed with his questioning was based on two different reasons. Denial of the right to cross-examination of the prosecutor on the basis of the court's estimate of his credibility as a witness is improper, particularly since the *Brady* hearing is specifically designed to elicit information from the government and its representatives. While we agree with the trial judge that an officer of the court would not be inclined

---

[4] *Moore v Illinois,* 408 US 786, 794–795; 92 S Ct 2562; 33 L Ed 2d 706 (1972), codified the *Brady* rule to require: "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence".

to lie, the essence of the adversary process is not to discover perjury, but rather to reveal the truth. Therefore, preventing cross-examination of the prosecutor in the instant case improperly denied counsel a most valuable tool, if not to find out what the prosecutor did, to find out what someone else did.

Denial of permission to call the Chief of the Prosecutor's Recorder's Court Division presents an issue of materiality. We hold that sufficient connection had been demonstrated in his appearance at the witness's request for bail.

As *Giglio v United States,* 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972), and *Napue* have both determined, evidence concerning the credibility of a witness is relevant toward ensuring that defendant receives a fair trial. This is still the law in Michigan. In *People v Evans,* 30 Mich App 361; 186 NW2d 365 (1971), the Court of Appeals found reversible error in the trial court's refusal to allow the jury to be told that defendant's accomplice and codefendant who had testified against him was permitted after testifying but before the jury went out to plead to a lesser offense. See also *People v Bortnik,* 28 Mich App 198; 184 NW2d 275 (1970).

Therefore, we hold that the trial judge erroneously limited the scope of the *Brady* hearing, and that once requested, such a hearing should include all witnesses and all evidence which can reasonably cast light on the question to be determined.

### IV — *Was it Erroneous for the Trial Judge to Refuse to Rule Whether Defendant's Suppressed Confessions Could be Used to Impeach Him if He Testified?*

Shortly after his arrest, defendant Ike Reed,

because of promises made to him by police officers, confessed to the killings. As a result of its involuntary nature, the confession was suppressed as evidence in the presentation of the people's case in chief, but the pretrial order also expressly observed that use of the statements for impeachment purposes was reserved for decision by the trial judge.

At trial, defense counsel asked the judge how she would rule if defendant chose to testify and if the prosecutor attempted to impeach him by use of the suppressed statements. She refused to make a ruling in advance, but asked for a formal offer of proof. No offer of proof was made and defendant did not testify.

The Court of Appeals, relying on *Harris v New York,* 401 US 222; 91 S Ct 643; 28 L Ed 2d 1 (1971), and *People v Graham,* 386 Mich 452; 192 NW2d 255 (1971), ruled that the defendant's objection to the use of the confessions for impeachment was "unfounded". 49 Mich App 308, 324–325. We believe the objection sound and *Harris* and *Graham* not on point.

The difference between *Harris* and *Graham* and the instant case is that the former relate to impeachment because of failure to give due *Miranda* warnings, and the instant case relates to *involuntary confessions.* In order to deter the police from breaking the law, statements made prior to the *Miranda* warnings are unusable to prove the elements of the crime charged. However, such statements may still be used for impeachment purposes if otherwise trustworthy. Involuntary confessions, on the other hand, may never be used, both because the police broke the law but more importantly because an involuntary confession is always of questionable "trustworthiness". Consequently,

an involuntary confession, which is of questionable trustworthiness, is not a proper foundation for impeachment, whereas statements prior to *Miranda* warnings may be a perfectly sound foundation for impeachment. It is instructive to note *Harris* expressly states, "[p]etitioner makes no claim the statements made to the police were coerced or involuntary." 401 US 222, 224. Furthermore, *Harris* permits *Miranda*-barred evidence to impeach "provided of course that the *trustworthiness* of the evidence satisfies legal standards". (Emphasis added.) 401 US 222, 224.

As indicated, the impropriety in using an involuntary confession for impeachment purposes is that it is untrustworthy evidence either to prove guilt or impugn credibility. The Supreme Court of Oregon put it forcefully and persuasively in *State v Smith,* 242 Or 223, 226; 408 P2d 942, 944 (1965), as follows:

"An involuntary confession is just as untrustworthy when used for impeachment purposes as when used to prove guilt. Such a confession is of no greater credibility when used to prove defendant a liar than when it is used to prove him guilty."

We therefore hold that an involuntary confession because of its untrustworthy evidentiary value is not usable either as direct evidence or for impeachment purposes.[5] The trial judge erred in not ruling that the involuntary confessions could

---

[5] *See* 89 ALR2d 480:

"The weight of authority supports the rule that a defendant in a criminal prosecution who is a witness in his own behalf cannot be compelled on cross-examination to testify with respect to statements made by him out of court which amount to a confession of the crime, unless it is first shown that the confession was voluntary or, in some instances, was otherwise properly qualified for admission, and that this is true even though the evidence is offered by the prosecution, not as a confession, but merely as a contradictory statement for the purpose of impeaching the defendant as a witness in his own behalf."

not be used for impeachment, as did the Court of Appeals in supporting her.

## V — *Were* Miranda *Warnings Timely Given?*

In determining whether the investigation had become accusatory and the defendant entitled to his *Miranda* warnings, the Court of Appeals applied the rule in *People v Wasson,* 31 Mich App 638, 642; 188 NW2d 55 (1971), that the "deciding factor, in each case, is determined by examining the specificity of the investigation, *i.e.,* whether the investigation has focused on one suspect". 49 Mich App 308, 319. The Court of Appeals concluded there was not such focus. We approve the test employed and believe it should be used by examining the totality of the circumstances.[6] However, we disagree with the Court's conclusion.

Following discovery of the two bodies in the alley, the police followed a trail of blood and drag marks into a four-apartment building. The dead bodies exhibited signs to the police of narcotic use and they suspected that the homicide was narcotics connected. Finding no evidence of homicide in the first three apartments, the police sought entrance into the fourth and final apartment from the manager, but his key did not fit. Officer Clemons testified that at this point defendant came

---

[6] Professor Kamisar suggests these guidelines for determining whether investigation is custodial:

" '(1) The subjective intention of the questioning officer to hold the person or to arrest him? (2) The degree to which the investigation has "focused" on the person, or, a variation of the same approach, whether or not the police have "probable cause" to arrest the person? (3) The subjective belief of the person that he is significantly deprived of his freedom? (4) The belief of the person, as a "reasonable man" that his freedom is significantly impaired?' He maintains that approach (4) should be controlling. Kamisar, 'Custodial Interrogation' within the meaning of *Miranda,* Criminal Law & the Constitution 335, 362 (Reed et al. eds. 1968)." Quoted in 3 Wigmore on Evidence (Chadbourne rev), § 826a, p 386, fn 26.

down the hall and put his key into the door. Officer Clemons testified "He [the defendant] affirmed that he did live here and that we may come in". Officer Hill testified similarly.[7] As the officers entered, from the way the door opened and the way the windows were barred and from the presence of narcotics paraphernalia, "it was at once apparent that this was a narcotics pad".

The police proceeded from the living room to the bedroom and from there to the kitchen. The bedroom floor showed it had recently been cleaned and there was a wet mop with red-tinged water on it. This caused the police to suspect that there had been blood on the floor.

The police also found some trousers soaking in red-tinged water that appeared to indicate blood. The trousers themselves seemed marked with the remains of blood stains.

At this point Officer Clemons admitted the police "had, perhaps, found the scene of the homicide" and that the defendant "perhaps knew something about" the homicide and "[m]ore than that, perhaps".

In view of narrowing their investigation down to what they believed to be the place of the homicide and to the owner of that place, the defendant, whom they believed to be connected with that homicide, by knowledge and "[m]ore than that, perhaps", the question arises whether the investigation had not "focused". This question is important because the police, without giving a *Miranda* warning, had the following colloquy with defendant as reported by Officer Hill:[8]

---

[7] Officer Hill testified:

"I identified myself as a police officer and * * * I asked him if he lived there and he said he did and we told him we would like to have a look around if he didn't mind."

[8] Officer Hill at the *Miranda* hearing testified that "We never really

"*A.* Yes, we questioned the defendant about the trousers and the suspected blood stains on them. He stated that they were his trousers and that he had injured himself while playing around with a lawn mower on Marlborough and at this time we told him that we had someone coming out from the scientific lab to check the water and the floor and the walls for blood and that if the blood on the trousers matched the blood of the deceased that we found in the alley, there might be a little trouble.

"*Q.* Did he make any response to this answer?

"*A.* Yes, he changed his statement.

\* \* \*

"*A.* He changed his statement with relationship to the trousers at first.

"*Q.* What did he tell you about the trousers the second time?

"*A.* He stated the second time the trousers were not his; he found them on the rear steps, so *[sic]* they probably would fit him and probably ·meant to soak them.

\* \* \*

"*A.* At this time we advised the defendant of his constitutional rights."

Before this colloquy then, we must ask ourselves, "had the investigation 'focused' on the defendant?"[9]

From the above facts there can be no question

---

suspected him" even after the first question. "I thought he was a flunky. I thought he was sent there to clean up the place for someone else. I never suspected Mr. Reed". However, on direct, Officer Hill had earlier testified that before going into defendant's apartment, he and his partner asked defendant if he lived there and "he replied in the affirmative". Also the question about whether or not defendant lived in the apartment and the answer that "he worked for George Baker at that address" was not until after the officers questioned defendant and he denied his statement about the trousers.

[9] At the time the question and statement were put there appears to have been at least three officers in the defendant's apartment. There may have been six to ten more, although that many may not have been present at one time or at that particular point of time. In any event, the defendant was far from alone.

but that the investigation had "focused" on the murder site.

Had the investigation "focused" as well on "one suspect"? The defendant had the key to the apartment and was in fact entering it. When the police asked him, he said it was his apartment. The only question left was were the bloody pants the defendant's—if they were, Officer Hill indicated that would tend to link defendant with the murders.

The ultimate question then really is whether the interrogation about defendant's ownership of the trousers was merely preliminary exploration or was it the "clincher"? Looking at all the facts, the latter alternative seems by far the more reasonable.

As a consequence we hold that the investigation had focused on defendant before the trouser-ownership question was asked and that the defendant therefore should have been given a *Miranda* warning before that question was asked.

### VI — *Was the Search Reasonable as One to Which Defendant Gave His Valid Consent?*

Defendant made a pretrial motion to suppress certain incriminating evidence[10] seized by police

---

[10] At the evidentiary hearing, defense counsel reported that the evidence consisted of the following:

"Mr. Ziemba: Seized, so far as the defendant can determine a vial of 4 cc of bloodstained water taken from the kitchen; a small drop of blood taken from the bedroom floor, a small drop of blood wiped off, scraped off the bedroom floor, the foot of the bed, a pair of orange striped dacron knit slacks found soaking in the kitchen and a pair of red crush leather and smooth leather loafers taken from the defendant; a blue-green, yellow, red and yellow top blanket taken from the porch and three drinking glasses taken from the drainboard of the kitchen sink; a syringe marked off in units; a disposable hypodermic needle and plastic eyedropper; a red metal screw tap which was taken from the kitchen cabinet, a wet mop taken from the kitchen; 3, 22 caliber 85 gold toned bullet *[sic]* on evidence tag 959799 and a packet of narcotics on evidence tag 965405; identification papers of the

officers in his apartment, contending that, as he did not know he could refuse permission for them to enter, he did not knowingly waive his Fourth Amendment rights and validly consent to the search.

At the evidentiary hearing, testimony was received from police officers and the apartment manager that the police, without a search warrant, had, upon their discovery of the bodies in the alley and the drag marks and blood stains leading into the building, followed that trail, and, with the aid of the apartment manager, investigated three of the four apartments, finding nothing to connect them with the homicides.

When the apartment manager's key would not fit into the lock of the fourth apartment, belonging to defendant, the police were in the manager's office, directly across the hall, telephoning the scientific laboratory for assistance. Defendant fortuitously appeared at the door and placed his key in the lock. The police approached him, and, according to their testimony and that of the manager, identified themselves and asked if they might come in and look around. They said defendant was not only courteous and genial, but also pointed out places to look. They indicated that at no point was he restrained and that defendant was not given his *Miranda* rights at that time because he was not suspected of anything. There were initially at least three, and perhaps four, officers in the apartment, with the number of police personnel, including those from the lab, finally totaling ten.

defendant on evident *[sic]* tag 965416 and upper dentures on evidence tag 965487; miscellaneous keys, one brass bell, pad, electric bill, one 22 caliber cartridge, one three-foot length plastic clothes line, one plastic bag and extension cord and towel on evidence tag 965403. These are the items that the defendant knows of and there may be other items seized by the police unknown to the defendant."

Defendant, however, testified that he was ordered to open the door by two detectives and two patrolmen, that he insisted on their showing him a search warrant, and that they pushed their way into the apartment. Once they were inside, he said there was a "fight" (which he defined as not physical) in which he again demanded to see a warrant and the police forced him to sit down while they searched.

At the conclusion of the evidentiary hearing, the court ruled that defendant had validly consented to the search of his apartment. The Court of Appeals affirmed.

A warrantless search and seizure is unreasonable per se and violates the Fourth Amendment of the United States Constitution and art 1, § 11 of the state constitution unless shown to be within one of the exceptions to the rule. 20 Michigan Law & Practice, Searches & Seizures, § 2. The burden is always on the state to show such an exception exists. *People v Chism,* 390 Mich 104, 123; 211 NW2d 193 (1973). *Coolidge v New Hampshire,* 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971).

In the instant case, the government argues that defendant's valid consent rendered the search reasonable. "Whether a consent is valid is a matter of fact based upon the evidence and all reasonable inferences to be drawn from it." 390 Mich 104, 123. The presence of coercion or duress would require a finding that consent was not given. *People v Kaigler,* 368 Mich 281, 294; 118 NW2d 406 (1962).

The Court of Appeals correctly noted that the United States Supreme Court has rejected defendant's contention that knowledge of the right to refuse admittance to police is required before consent to a search can be considered valid. The law

today is that knowledge of the right to refuse is but one factor in the totality of circumstances to be examined in construing the reasonability of a search.

"[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecutor is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth v Bustamonte,* 412 US 218, 248–249; 93 S Ct 2041; 36 L Ed 2d 854 (1973).

Refusing to apply the *Johnson v Zerbst* standard that the state must demonstrate "an intentional relinquishment or abandonment of a known right or privilege"[11] in order to show consent to a search, 412 US 218, 238–245, the Court in *Schneckloth* indicated these general principles should be followed:

(1) "While the Fourth and Fourteenth Amendments limit the circumstances under which the police can conduct a search, there is nothing constitutionally suspect in a person's voluntarily allowing a search." 412 US 218, 242–243.

(2) "[U]nlike those constitutional guarantees that protect a defendant at trial, it cannot be said every reasonable presumption ought to be indulged against voluntary relinquishment." 412 US 218, 243.

(3) "[T]he community has a real interest in encouraging consent * * * ." 412 US 218, 243.

---

[11] 304 US 458, 464; 58 S Ct 1019; 82 L Ed 1461 (1938).

(4) A waiver approach is unrealistic in "the informal, unstructured context of a consent search", and would be inconsistent with third-party consents.[12] 412 US 218, 245.

(5) Absent evidence of inherently coercive tactics, either from the nature of police questioning or conduct, or the environment and atmosphere in which events occur, traditional tests for determining voluntariness of consent will apply. 412 US 218, 247.

(6) "[T]he failure to require the Government to establish knowledge as a prerequisite to a valid consent" will not "relegate the Fourth Amendment to the special province of 'the sophisticated, the knowledgeable and the privileged.' " 412 US 218, 247–248.

Analogizing to the problem of coerced confessions, the Court found these criteria did not turn on the presence or absence of a single factor, but required careful scrutiny of the totality of all the surrounding circumstances. Applying these *Schneckloth* criteria, we find the following facts made up the relevant circumstances:

(1) The police followed a trail of blood stains and drag marks from two bodies into an apartment building and had already searched all other apartments when they reached defendant's. They had no search warrant.

(2) The apartment manager tried to let the police enter defendant's apartment, but his key would not work.

(3) The police were in the doorway of the manag-

---

[12] No argument is raised in the instant case that had his key fit, the apartment manager could have validly consented to the search of defendant's rooms. Of course, an owner and his or her agent may not consent to search for a tenant unless the right is contracted for. *Chapman v United States,* 365 US 610; 81 S Ct 776; 5 L Ed 2d 828 (1961).

er's apartment, directly across the hall, when they
saw defendant come to his door and insert his key.

They say they identified themselves, asked
whether defendant lived there, and when he an-
swered yes, asked if they could come in and look
around. They did not give defendant *Miranda*
warnings at that time, nor did they advise him of
his right to refuse admission. They also did not tell
him why they were there.

The police say defendant granted permission for
the police to enter and look around. Defendant
claims he was forced to let the police in and asked
to see a search warrant.

(4) The police made one hasty swing through the
apartment, then made a more careful search, with
the aid of persons from the scientific bureau.
There were at least six police officers and three
members of that bureau in the apartment with
defendant.

(5) Defendant was given his *Miranda* rights after
the police questioned him about bloody trousers
found soaking in water in the sink. At that time
he was arrested. The search was still proceeding.

(6) Following their initial entrance into the
apartment, the police asked other officers and the
scientific personnel to enter. Defendant was never
asked if these additional people could come in and
search.

(7) The police testified that defendant was not
only free to wander around the apartment, but
also pointed out places for them to search. Defend-
ant says he was forced to remain seated, but was
not handcuffed until he was arrested.

The trial court and the Court of Appeals found
that the defendant had validly assented to the
police entry and search. Upon review of the evi-
dence this Court reaches the same conclusion.

There is sufficient evidence to support a holding that the police asked permission to enter and that consent was given to a general search. Further, just as the mere fact of custody without more, does not necessarily render consent involuntary, *United States v Jordan,* 399 F2d 610, 614 (CA 2, 1968), the presence of a large number of officers in an apartment does not present a situation which is per se coercive.

The United States Supreme Court in *Schneckloth* implied that situations where *Miranda* warnings were required may still not be such as to invalidate consent to a search.[13] The instant case is such a situation.

The trial court's and the Court of Appeals' holdings that consent was validly given to the search and that the evidence was correctly not suppressed were not clearly erroneous. We affirm.

## VII —*Conclusion*

In view of our previous findings of error, we believe it unnecessary to reach defendant's other claims of error, most of which would not be necessarily pertinent to another trial in any event. However, the majority of this Court agree with defendant's objection to the introduction of the specified photographs of the nude dead bodies. *People v Falkner,* 389 Mich 682; 209 NW2d 193 (1973).

The Court of Appeals and the trial court are

---

[13] "We decline to follow what one judicial scholar has termed 'the domino method of constitutional adjudication * * * wherein every explanatory statement in a previous opinion is made the basis for extension to a wholly different situation.'" 412 US 218, 246, quoting Friendly, *The Bill of Rights as a Code of Criminal Procedure,* 53 Cal L Rev 929, 950 (1965).

reversed. We remand for new trial not inconsistent with this opinion.

T. G. KAVANAGH, C. J., and T. M. KAVANAGH, SWAINSON, LEVIN, and J. W. FITZGERALD, JJ., concurred with WILLIAMS, J.

M. S. COLEMAN, J., concurred in the result.