*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DEVON DESHAWN-GENE WILLIAMS,

      Defendant-Appellant.

UNPUBLISHED
September 19, 2019

No. 341838
Macomb Circuit Court
LC No. 2017-000047-FC

Before: O'BRIEN, P.J., and BECKERING and LETICA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial conviction of first-degree premeditated murder, MCL 750.316(1)(a). The trial court sentenced defendant to life imprisonment without parole. We affirm.

## I. BACKGROUND FACTS

This case arises from the March 2016 death of defendant's wife, Michelle Williams. At the time of the incident, defendant and the couple's two-year-old daughter, DEP, were present in Williams' home. During that morning, defendant arrived at his mother's home to drop off DEP, despite that defendant and Williams were not on speaking terms with his mother. Defendant mentioned to his mother that Williams was unconscious, which prompted defendant's mother to contact Williams' mother, Terri Perry, who in turned called 911.

When officers arrived at Williams' home, defendant was outside in an automobile. Defendant eventually surrendered to police. Defendant told police that he had ingested an excessive number of pills, so he was escorted to a hospital where he was admitted and placed on suicide watch. Officers found Williams' lifeless body in her home.

A Macomb County deputy medical examiner performed an autopsy of Williams' body, and she opined that the cause of death was asphyxia due to manual strangulation. Two days after Williams' death, Warren Police Sergeant Christopher Livingston interviewed defendant in the hospital where he remained under arrest. During the interview, defendant first denied knowing what happened to Williams, but later said that he and Williams had been fighting, he placed his

-1-

elbow on her neck, and, at some point, Williams stopped fighting him. During trial, defendant testified that, on the morning that Williams died, he had attempted to commit suicide. Defendant explained that this angered Williams, and she attacked him with a hammer and then a knife. Defendant testified that after Williams attacked him, he placed his elbow on Williams' neck in an attempt to calm her down while restraining her.

## II. MOTION TO SUPPRESS CUSTODIAL STATEMENT

Defendant first argues that the trial court should have granted his motion to suppress the statements he made during his interview with Sergeant Livingston. We disagree.

A trial court's factual findings at a suppression hearing are reviewed for clear error, while its ultimate ruling on the motion to suppress is reviewed de novo. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005). "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Johnson*, 466 Mich 491, 497-498; 647 NW2d 480 (2002).

"Both the state and federal constitutions guarantee that no person shall be compelled to be a witness against himself or herself." *People v Cortez*, 299 Mich App 679, 691; 832 NW2d 1 (2013), citing US Const, Am V, and Const 1963, art 1, § 17. "To protect a defendant's Fifth Amendment privilege against self-incrimination, custodial interrogation must be preceded by advice to the accused that 'he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " *Cortez*, 299 Mich at 691, quoting *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

"Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights." *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010). "Whether a defendant's statement was knowing, intelligent, and voluntary is a question of law, which the court must determine under the totality of the circumstances." *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005). "[T]he analysis must be bifurcated, i.e., considering (1) whether the waiver was voluntary, and (2) whether the waiver was knowing and intelligent." *Id*.

"[W]hether a waiver of *Miranda* rights is voluntary depends on the absence of police coercion." *People v Daoud*, 462 Mich 621, 635; 614 NW2d 152 (2000). "The test of voluntariness is whether, considering the totality of all the surrounding circumstances, the confession is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired." *People v Givans*, 227 Mich App 113, 121; 575 NW2d 84 (1997). In other words, "the relinquishment of the right must have been 'voluntary,' in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *People v Tanner*, 496 Mich 199, 209; 853 NW2d 653 (2014) (quotation marks and citations omitted).

"With regard to the voluntariness of [a] defendant's statements to the police officers, we examine the entire record and make an independent determination of voluntariness." *People v Peerenboom*, 224 Mich App 195, 198; 568 NW2d 153 (1997). In doing so, we are mindful of

the trial court's superior ability to view the evidence and the witnesses that appear before it. *Id*. Relevant considerations include "the duration of the defendant's detention and questioning; the age, education, intelligence, and experience of the defendant; whether there was unnecessary delay of the arraignment; the defendant's mental and physical state; whether the defendant was threatened or abused; and any promises of leniency." *Gipson*, 287 Mich App at 265.

Defendant contends that, during his interview with Sergeant Livingston, he did not voluntarily waive his rights because "the delay in speaking with [defendant] was both too long and too short"—it was too long because defendant had been arrested for two days and still not arraigned, and it was too short because defendant was still under suicide watch at the hospital. On this second point, defendant appears to contend that he could not have voluntarily waived his right because he had a history of mental issues and testified that he "wasn't right" at the time of the interview. Defendant's contentions have no merit.

The trial court held a hearing on defendant's motion to suppress. Sergeant Livingston testified that, on March 4, 2016, he spoke with defendant at the hospital, where defendant had been for two days because he had "taken some pills." Sergeant Livingston explained that defendant was "under arrest" at the hospital, and he confirmed that defendant was handcuffed to his hospital bed. Sergeant Livingston also explained that there was a "patient sitter" in defendant's room because defendant was on "suicide watch." Sergeant Livingston's interview with defendant was recorded.

According to Sergeant Livingston, the detective who accompanied him went over defendant's *Miranda* rights, and defendant said that he understood. Afterward, the detective and defendant discussed defendant's educational background, and defendant explained that he had completed 12th grade. Sergeant Livingston testified that defendant "appeared fine" and "lucid" to him. Sergeant Livingston confirmed that defendant did not appear to be under the influence of any drugs or medication; Sergeant Livingston was able to communicate "back and forth" with defendant, and defendant said that he could understand English and was not under the influence of drugs or alcohol. Additionally, defendant did not indicate that he was tired, that he needed to sleep, or that he was thirsty or hungry, and it appeared to Sergeant Livingston that all of defendant's physical needs were being met. Sergeant Livingston confirmed that he asked defendant if he was being treated fairly, and defendant replied, "Most definitely."

Defendant testified that he was "all over the place" when he spoke with Sergeant Livingston. Defendant explained that he "wasn't right" at that time and that he "just wasn't in the right frame of mind." He testified that he took 20 Trazodone pills on the day of Williams' death, and he confirmed that his ingestion of those pills caused an overdose that resulted in confusion and lethargy. Defendant said that he did not understand that he could have chosen to not speak with Sergeant Livingston and that he could have had an attorney present during their interview. However, during cross-examination, defendant testified he "didn't know if [he] had to talk to the police or not," but agreed that "it was [his] choice" to speak with them.

The trial court ruled that defendant's statements to Sergeant Livingston were knowingly, intelligently, and voluntarily made, and it explained that it had reviewed defendant's medical records and a video of defendant's interview before making its ruling.

For defendant's first argument—that his waiver was not voluntary because it had been two days since his arrest and he still had not been arraigned—he does not explain how the delay between his arrest and his arraignment undermined the voluntary nature of his waiver of rights and his statements to Sergeant Livingston. Rather, defendant simply contends that the delay was "too long." While it is true that one of the factors a trial court should consider is whether "there was unnecessary delay of the arraignment," *Gipson*, 287 Mich App at 265, defendant has failed to explain why the two-day delay was "unnecessary." Sergeant Livingston testified that defendant was admitted to the hospital following his arrest because defendant disclosed to other officers that he had "taken some pills," and that defendant was on "suicide watch" at the time of the interview. Defendant does not argue that his admission to the hospital was the result of police coercion. To the contrary, he acknowledges that his admission to the hospital occurred after "he had taken a handful" of pills. It is therefore undisputed that defendant's own actions resulted in his admission to the hospital, which caused the delay. Police clearly could not have interviewed defendant on the day he was brought to the hospital because, based on defendant's own testimony, his ingestion of the pills made him confused and lethargic. Thus, the two-day delay between defendant's arrest and the interview was not "unnecessary."

As for defendant's second argument—that the delay between his arrest and his interview was too short because he "wasn't right" and was in a "fog"—we conclude that it does not entitle defendant to relief. Defendant's reiteration of his testimony from the motion hearing and the fact that he was admitted to a hospital during his interview does not demonstrate how the trial court clearly erred when it determined that his waiver of rights and his statements during the interview were voluntarily made. As already noted, defendant agreed during cross-examination that it was his choice to speak with the police, and before making its ruling, the trial court reviewed defendant's medical records as well as a recording of the interview. It is apparent to us that the trial court considered defendant's testimony along with all of the other information that it had before it, and concluded that, "considering the totality of all the surrounding circumstances," *Givans*, 227 Mich App at 121, defendant's waiver was voluntary. The only evidence that tends to militate against this finding was defendant's testimony at the suppression hearing, and because we defer to the trial court's superior ability to assess the witnesses that appear before it, we find no error in the trial court's ultimate conclusion.

## III. EXCITED UTTERANCE

Defendant next argues that the trial court erred when it ruled Williams' father, Ricky Perry, was permitted to testify about a statement DEP made on the day of Williams' death because, according to defendant, DEP's statement was inadmissible hearsay. We disagree.

A trial court's decision whether to admit evidence is reviewed for an abuse of discretion. *People v Duncan*, 494 Mich 713, 722; 835 NW2d 399 (2013). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes[.]" *People v Swain*, 288 Mich App 609, 628-629; 794 NW2d 92 (2010). But a trial court necessarily abuses its discretion when it makes an error of law in the interpretation of a rule of evidence. *People v Jackson*, 498 Mich 246, 257; 869 NW2d 253 (2015). We review questions of law de novo. *Id.*

Hearsay "is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c).

Hearsay is inadmissible unless it falls under one of several exceptions. MRE 802. MRE 803 provides exceptions to the hearsay rule that apply "even though the declarant is available as a witness . . . ." MRE 803(2) excepts from the hearsay rule "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." This "excited utterance" exception "allows hearsay testimony that would otherwise be excluded because it is perceived that a person who is still under the sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication so that any utterance will be spontaneous and trustworthy." *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998) (quotation marks and citation omitted). "The pertinent inquiry is not whether there has been time for the declarant to fabricate a statement, but whether the declarant is so overwhelmed that she lacks the capacity to fabricate." *People v McLaughlin*, 258 Mich App 635, 659-660; 672 NW2d 860 (2003).

At trial, defendant testified that, on the morning Williams died, DEP stayed in his and Williams' bedroom. According to defendant, after the incident with Williams, his "first reaction" was to get DEP "out of that situation," so he took DEP to his mother's home. Terri testified that, later that same day, she picked DEP up from the defendant's mother's home.

Terri took DEP back to her home, and Ricky eventually joined them. Later that same day, Ricky found DEP sitting on a couch in the living room, where she was not allowed. According to Ricky, DEP had never violated that rule before. Ricky testified that DEP was "[s]itting on the couch with her arms folded, looking like in a daze," and Ricky began talking with the child. He confirmed that DEP made "a statement," and he confirmed that the "statement" described "an event that had occurred close in time to [the] moment" that DEP "had perceived [it] herself." Ricky asked DEP "what's wrong," and DEP responded: "Pe-pa [DEP's nickname for Ricky], Mommy, Mommy. Stop, Devvy (ph), stop, Devvy, and Mommy crying." Ricky asked DEP, "What you [sic] say?" DEP replied, "Mommy crying, stop, Devvy, stop, Devvy." According to Ricky, DEP then started crying, and Ricky "just grabbed and [held] her." During trial, defendant's counsel objected and argued that Ricky's testimony about DEP's statement was inadmissible hearsay, but the trial court ruled that DEP's statement was admissible as an excited utterance.

Defendant argues that the trial court erred when it ruled that DEP's statement was an excited utterance because, according to Ricky's testimony, she was "in a daze" and so could not be under the stress of excitement when she made her statement. Defendant also appears to contend that DEP's statement could not be an excited utterance because it was made in response to a question posed by Ricky, so was not caused by the event. Defendant's arguments lack merit.

As for defendant's first argument, there was evidence to support that, when DEP made her statement, she was indeed under the stress of excitement caused by Williams' death. Ricky testified that DEP made the statement on the same day as Williams' death. Ricky also testified that before DEP made her statement, she appeared to be "in a daze" with her arms folded while she sat on a couch in Ricky's living room, where she was not allowed and had never broken that rule before. Defendant appears to contend that because DEP was "in a daze," she could not have made an "excited" utterance. But one does not need to be "excited" as that word is commonly used to make an "excited utterance." The excited utterance exception looks to whether the declarant is overwhelmed by the stress of the event when she made the statement, *McLaughlin*,

258 Mich App at 659-660, and it is not uncommon for a person overwhelmed by the stress of a traumatic event to be "in a daze." On these facts, it was not outside the range of reasonable and principled outcomes for the trial court to conclude that DEP's unusual behavior and demeanor showed that she was under the stress of excitement caused by Williams' death.

Turning to defendant's second argument, he does not explain why it is significant that DEP made her statement in response to a question posed by Ricky. Ricky's question was nonspecific, asking only "what's wrong?" Defendant does not explain how Ricky asking DEP a question establishes that DEP was not under the stress of excitement caused by Williams' death, or how Ricky's posing of a question to DEP before she made her statement shows that DEP had the capacity to fabricate. See *Smith*, 456 Mich at 550. Moreover, DEP's response to Ricky's question does little to suggest that DEP had the capacity to fabricate, as her statement to Ricky seemingly did not directly respond to Ricky's question. In sum, defendant has not persuaded us that the trial court abused its discretion when it allowed DEP's statement into evidence under the excited utterance exception to the hearsay rule.

## IV. RES GESTAE WITNESS

Defendant asserts that he is entitled to a new trial because the prosecution failed to list DEP as a res gestae witness on its witness list. We disagree.

A res gestae witness is "one who is present at the scene of the alleged crime, at the time of the alleged crime, or one who had occasion to observe the surrounding events and circumstances." *People v Dyer*, 425 Mich 572, 577 n 4; 390 NW2d 645 (1986).

Under MCL 767.40a, "the prosecutor has a duty to attach to the information a list of all witnesses the prosecutor might call at trial and of all known res gestae witnesses, to update the list as additional witnesses became known, and to provide to the defendant a list of witnesses the prosecution intended to call at trial." *People v Koonce*, 466 Mich 515, 520-521; 648 NW2d 153 (2002). MCL 767.40a(1) requires a prosecutor to "attach to the filed information a list of all witnesses known to the prosecuting attorney who might be called at trial and all res gestae witnesses known to the prosecuting attorney or investigating law enforcement officers," and MCL 767.40a(2) provides that a prosecutor "shall be under a continuing duty to disclose the names of any further res gestae witnesses as they become known."

"The underlying purpose of the statute is to provide notice to the accused of potential witnesses." *People v Everett*, 318 Mich App 511, 518; 899 NW2d 94 (2017). The "purpose of the 'listing' requirement is merely to notify the defendant of the witness' existence and res gestae status." *People v Gadomski*, 232 Mich App 24, 36; 592 NW2d 75 (1998) (quotation marks and citation omitted).

"[T]o warrant reversal for a violation of MCL 767.40a, [a] 'defendant must show that he was prejudiced by noncompliance with the statute.' " *Everett*, 318 Mich App at 523, quoting *People v Duenaz*, 306 Mich App 85, 104; 854 NW2d 531 (2014). That is, defendant's conviction will stand even if the prosecution violated the procedure described in MCL 767.40a so long as it does not affirmatively appear more probable than not that a different outcome would have resulted without the error. *Everett*, 318 Mich App at 523-524; MCL 769.26.

Defendant asserts that he was prejudiced by the prosecution's failure to list DEP as a res gestae witness on its witness list because the statement Ricky attributed to her was "important." Defendant contends that he was placed in the "difficult position of having to consider calling [DEP] as a witness midway through trial, without having advance preparation time to interview the child."

During trial, defendant testified that DEP was in Williams' home on the day of Williams' death. Clearly, then, defendant knew that DEP may have witnessed the events surrounding Williams' death. Assuming that DEP's vague statement rendered her a res gestae witness, defendant's own knowledge that DEP was present in Williams' home shows that the purpose of MCL 767.40a(1)'s listing requirement was satisfied, despite any error by the prosecution's failing to list DEP as a res gestae witness.

Even so, defendant is unable to demonstrate how the prosecution's failure to list DEP as a res gestae witness resulted in prejudice. Defendant's prejudice argument centers on his belief that DEP's statement was singularly damaging to his defense. But DEP's statement was vague and bereft of any meaningful details, whereas the other evidence against defendant strongly suggested that he murdered Williams. The deputy medical examiner testified that Williams' cause of death was "[a]sphyixa due to manual strangulation," and that while a person would lose consciousness after 5 to 10 seconds of manual strangulation, it would take approximately 3 to 5 minutes for a person to die. Sergeant Livingston testified that during his interview with defendant, defendant initially stated that he did not know what happened to Williams. According to the sergeant, during the same interview, defendant eventually revealed that "at one point it became physical between [him and Williams] and he had put his elbow around her neck, taking [Williams] to her knees and eventually to the ground." Sergeant Livingston testified that defendant said that Williams had been "fighting and at one point she stopped fighting." Defendant even admitted during his own testimony that he had placed his "right elbow" on Williams' throat while he was trying to get Williams to "calm down," and that she eventually stopped swinging her free arm while he was restraining her in that fashion. Given that defendant initially denied knowing what happened to Williams and then eventually admitted to essentially causing her death, coupled with the medical examiner's testimony about the amount of time it would take for a person to die versus lose consciousness when strangled, we cannot agree that DEP's vague statement to Ricky was outcome-determinative.[1]

## V. ADMISSIBILITY OF VICTIM'S PRIOR ACTS

Defendant argues that the trial court erred when it limited testimony regarding specific incidents of violence committed by Williams. We disagree.

"In order to properly preserve an issue for appeal, a defendant must raise objections at a time when the trial court has an opportunity to correct the error . . . ." *People v Pipes*, 475 Mich

---

[1] Moreover, Ricky's testimony about DEP occurred on the third day of trial, October 19, 2017. The prosecution did not finish presenting evidence until October 24, 2017. Defendant therefore had ample time to prepare and ultimately determine whether to call DEP as a witness.

267, 277; 715 NW2d 290 (2006) (quotation marks and citation omitted). In the context of the exclusion or limitation of evidence, a defendant must also make an adequate offer of proof to identify the relevant evidence or issues that the defendant was unable to present. *People v McPherson*, 263 Mich App 124, 137-138; 687 NW2d 370 (2004).

During trial, defendant's counsel asked Ricky if Williams had "been in altercations before," and Ricky said, "I don't know." Defense counsel then asked if Ricky was "aware of a situation where [Williams] had --" but before he finished the question, the prosecution objected because, according to the prosecutor, the question called for Ricky to testify about character evidence. The trial court sustained the prosecution's objection. Defendant's trial counsel did not make an offer of proof about the excluded evidence, so this issue is not preserved.

Unpreserved claims are reviewed for plain error affecting substantial rights. *People v Buie*, 285 Mich App 401, 407; 775 NW2d 817 (2009). Under the plain error rule, a defendant must demonstrate that an error occurred, the error was plain, and the plain error affected substantial rights. *Id.* "The third prong requires a showing of prejudice, which occurs when the error affected the outcome of the lower court proceedings." *People v Putman*, 309 Mich App 240, 243; 870 NW2d 593 (2015).

MRE 404 provides, in relevant part:

> **(a) Character evidence generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> * * *
>
> (2) *Character of alleged victim of homicide.* When self-defense is an issue in a charge of homicide, evidence of a trait of character for aggression of the alleged victim of the crime offered by an accused[.]
>
> * * *
>
> **(b) Other crimes, wrongs, or acts.**
>
> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MRE 405 provides:

> (a) **Reputation or Opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as

to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into reports of relevant specific instances of conduct.

(b) **Specific Instances of Conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

Initially, we note that MRE 404(a)(2) is not applicable to this situation. Defendant argues that the trial court erred by not allowing him to introduce evidence of *a specific instance of Williams' conduct*, not her trait of character for aggression. Defendant's trial counsel questioned Ricky about whether Williams generally got into fights, which Ricky answered. The trial court only sustained the prosecutor's objection when defense counsel asked about a specific instance of Williams' conduct. Thus, MRE 404(a)(2) is not applicable because that rule concerns evidence of "a trait of character for aggression," not specific instances of a person's conduct.

MRE 404(b), on the other hand, permits evidence of specific instances of a person's conduct. Relying on this rule, defendant argues that "Williams' prior bad act was admissible to show a 'system in doing an act' of lashing out, when very angry and/or threatened, and using whatever was at her disposal as she was taught." But defendant merely asserts that the excluded evidence would have demonstrated Williams' system in doing an act as it pertains to violent conduct—he fails to furnish an offer of proof what this conduct was, thereby precluding us from determining the validity of his claim. See *Everett*, 318 Mich App at 523 (explaining that the "defendant bears the burden of providing this Court with a record to verify the factual basis of any argument upon which reversal [might be] predicated") (quotation marks and citation omitted; alteration in *Everett*). Moreover, defendant gives this argument only cursory treatment, and "[a]n appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).[2]

Defendant's more compelling argument is that the trial court erred when it did not allow defendant to present evidence of Williams' prior violent conduct under MRE 405.[3] Much of

---

[2] Puzzlingly, defendant relies extensively on *People v Harris*, 458 Mich 310; 583 NW2d 680 (1998) to support his MRE 404(b) argument. That case dealt exclusively with MRE 404(a)(2) and MRE 405, and never even mentions MRE 404(b).

[3] Defendant argues that this evidence was admissible under both MRE 405(a) and (b) because, although it is a specific instance of Williams' conduct, defense counsel was cross-examining Ricky. See MRE 405(a) ("On cross-examination, inquiry is allowable into reports of relevant specific instances of conduct."). Defendant does not differentiate his 405(a) and (b) arguments, and neither do we. As explained in *People v Roper*, 286 Mich App 77, 97; 777 NW2d 483 (2009), "Given the differences between MRE 405(a) and MRE 405(b), the limitation in MRE 405(a) must be understood to prohibit the presentation of evidence regarding specific instances of conduct to prove character in any case except those covered under MRE 405(b)."

defendant's trial testimony pertained to how Williams repeatedly attacked him with weapons on the day of Williams' death, and how he was forced to disarm and restrain her in response. Relying largely on this testimony, defendant claimed that he killed Williams in self-defense.

On appeal, defendant argues that evidence of specific instances of Williams' violent conduct should have been admitted under MRE 405 because it was essential for his self-defense claim. Defendant appears to contend that specific instances of Williams' conduct were admissible to prove that she was the aggressor. This argument fails because specific instances of a victim's conduct are generally inadmissible to prove that the victim was the aggressor. *People v Harris*, 458 Mich 310; 583 NW2d 680 (1998). In holding this, the *Harris* Court explained:

> As a general rule, the character of the victim may not be shown by specific instances of conduct unless those instances are independently admissible to show some matter apart from character as circumstantial evidence of the conduct of the victim on a particular occasion.

> [W]hen character is not an essential element, it may be shown only by reputation or opinion evidence . . . . Hence, construed literally, Rule 405 does not permit a defendant to use specific instances to show that the victim was the aggressor since the aggressive character of the victim is not an essential element of the defense of self-defense since the aggressive character of the victim is introduced as circumstantial evidence to show that the victim committed the first or primary act of aggression against the defendant, which is to say that the defense of self-defense in this situation makes an act of the victim, rather than a trait of the victim's character, the material issue. [*Id*. at 319 (quotation marks and citation omitted; alterations in *Harris*).]

Alternatively, defendant appears to argue that specific instances of Williams' conduct were admissible to prove that he had a reasonable apprehension of harm. For specific instances of Williams' conduct to be admissible for this purpose, defendant had to have knowledge of the past conduct. See, e.g., *People v Edwards*, ___ Mich App ___; ___ NW2d ___ (2019) (Docket No. 344541); slip op at 3-4 (explaining that specific instances of the victim's conduct were admissible to prove the defendant's reasonable apprehension of harm because he knew of the past conduct); *Harris*, 458 Mich at 317 (explaining in the context of character evidence that, if "[t]he purpose of the evidence is to show the defendant's state of mind," then it "must have become known to him, otherwise it is irrelevant"); *People v Walters*, 223 Mich 676, 679; 194 NW 538 (1923) ("Defendant's fear of imminent death at the hands of the deceased, arising from apprehension because of his bad character, could not have come from what he had not heard."). Though defendant at one point in his appellate brief says that Williams' prior acts of violence were "known to [defendant]," defendant has failed to furnish an offer of proof that he did in fact know of the specific instances of Williams' conduct that he sought to admit into evidence. Without this offer of proof, we have no basis to conclude that the evidence of Williams' past conduct was admissible; if defendant did not know of the conduct, then it was irrelevant. *Harris*, 458 Mich at 317; MRE 402 ("Evidence that is not relevant is not admissible.") Defendant has

-10-

therefore failed to carry his burden of providing the necessary factual basis for us to grant him relief on appeal. See *Everett*, 318 Mich App at 523.

But even assuming that defendant did carry this burden and that the trial court erred by excluding evidence of Williams' past conduct, defendant still cannot demonstrate that the trial court's ruling prejudiced him. Considerable evidence regarding Williams' disposition toward violent altercations was presented during trial. Terri testified that Williams was "the type of person that would stand up for herself[.]" Terri confirmed that Williams was a person who "stood up for her position," and she confirmed that Williams "[d]efended herself." Ricky confirmed that Williams was "the type of girl that would defend herself," and that he advised Williams to pick up "anything you see" as a weapon in the event she had to defend herself. Defendant testified that Williams attacked him with weapons on multiple occasions and did so on the morning of her death. Yet this was one of several different accounts of that morning that the jury heard that defendant gave, and it was the only account that contained details about Williams repeatedly attacking him with weapons. Even so, the jury had evidence before it from which it could accept defendant's claim that he acted in self-defense. But, problematically for this claim, there was also overwhelming evidence from which the jury could find defendant guilty, as previously discussed. We therefore conclude that defendant cannot demonstrate that additional evidence of specific instances of violent conduct committed by Williams would have been outcome-determinative. Defendant is not entitled to relief on this ground.

## VI. JURY INSTRUCTIONS

Finally, defendant argues that the trial court erred when it did not provide instructions to the jury pertaining to the lesser included offense of voluntary manslaughter and accident as defense to a specific intent crime. We disagree.

"Claims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Henderson*, 306 Mich App 1, 3; 854 NW2d 234 (2014). "The defendant bears the burden of establishing that the asserted instructional error resulted in a miscarriage of justice." *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010). A miscarriage of justice occurs when "it is more probable than not that a different outcome would have resulted without the error." *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

"When this Court reviews jury instructions for reversible error, we consider the instructions as a whole." *People v Richardson*, 490 Mich 115; 803 NW2d 302 (2011). "A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). "The jury instructions must include all elements of the crime charged, and must not exclude from jury consideration material issues, defenses or theories if there is evidence to support them." *People v Reed*, 393 Mich 342, 350; 224 NW2d 867 (1975) (citation omitted). "The trial court may issue an instruction to the jury if a rational view of the evidence supports the instruction." *People v Armstrong*, 305 Mich App 230, 240; 851 NW2d 856 (2014). "Even if somewhat imperfect, instructions do not create error if they fairly present to the jury the issues tried and sufficiently protect the defendant's rights." *People v Bartlett*, 231 Mich App 139, 143-144; 585 NW2d 341 (1998).

Under MCL 768.32, "a lesser offense instruction is appropriate only if the lesser offense is necessarily included in the greater offense." *People v Nickens*, 470 Mich 622, 626; 685 NW2d 657 (2004). "Necessarily included lesser offenses are offenses in which the elements of the lesser offense are completely subsumed in the greater offense." *People v Mendoza*, 468 Mich 527, 532 n 3; 664 NW2d 685 (2003). Therefore, "a requested instruction on a necessarily included lesser offense is proper if the charged greater offense requires the jury to find a disputed factual element that is not part of the lesser included offense and a rational view of the evidence would support it." *People v Cornell*, 466 Mich 335, 357; 646 NW2d 127 (2002).

Defendant contends that the trial court erred when it declined to instruct the jury on the lesser offense of voluntary manslaughter under M Crim JI 16.9 (Voluntary Manslaughter as a Lesser Included Offense of Murder). Assuming that this instruction was warranted, this Court has held that where the jury was given the option to convict a defendant of "an intermediate lesser offense" and elected to convict the defendant of the greater offense, the failure to give instructions on lesser offenses was harmless. *People v Wilson*, 265 Mich App 386, 396; 695 NW2d 351 (2005). The jury was instructed on second-degree murder, but convicted defendant of first-degree premeditated murder. Therefore, even if the trial court should have instructed the jury on the lesser included offense of voluntary manslaughter, the error was harmless because the jury elected to convict defendant of the greater offense when it had an option to convict defendant of a lesser offense.

Defendant also contends that the trial court erred when it refused to instruct the jury with M Crim JI 7.3a (Accident as Defense to Specific Intent Crime). M. Crim. JI 7.3a provides:

> The defendant says that [he/she] is not guilty of [*state crime*] because [he/she] did not intend to [*state specific intent required*]. The defendant says that [his/her] conduct was accidental. If the defendant did not intend to [*state specific intent required*], [he/she] is not guilty. The prosecutor must prove beyond a reasonable doubt that the defendant intended to [*state specific intent required*].

However, the trial court instructed the jury with M Crim JI 7.2 (Murder: Defense of Accident (Not Knowing Consequences of Act)). M Crim JI 7.2 provides,

> (1) The defendant says that [he/she] is not guilty of _____ because _____'s death was accidental. By this defendant means that [he/she] did not mean to kill or did not realize that what [he/she] did would probably cause a death or cause great bodily harm.

> (2) If the defendant did not mean to kill, or did not realize that what [he/she] did would probably cause a death or cause great bodily harm, then [he/she] is not guilty of murder.

"Even if somewhat imperfect, instructions do not create error if they fairly present to the jury the issues tried and sufficiently protect the defendant's rights." *Bartlett*, 231 Mich App at 143-144. The jury was instructed with M Crim JI 7.2, which provided that if defendant did not intend to kill Williams and Williams' death was accidental, then he was not guilty of murder. If the trial court had also instructed the jury with M Crim JI 7.3a, it would have resulted in

duplicative and redundant jury instructions. As the jury was fairly presented defendant's claim of accident, the trial court did not err when it refused to instruct the jury with M Crim JI 7.3a.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Jane M. Beckering
/s/ Anica Letica